## KIMBALL *et al.* *v.* GEARHART *et al.*

In an action for damages for the diversion of water from the plaintiff's ditch, the deposition of one of the owners in the ditch was taken by the plaintiff, and subsequently, and before the trial, the witness conveyed, by deed, his interest in the ditch to plaintiff: *Held*, that such deed of conveyance did not pass the witness' right to the damages, and hence, he was an incompetent witness.

To make the testimony of a witness admissible, he must be competent at the time of taking his deposition.  It is the effect of the interest on the witness at the time his testimony is taken, that disqualifies him.

The subsequent deed to plaintiff, though it carried the property and the future use of the water, did not retroact and carry the right to damages for the past illegal use of it, any more than a deed to land carries the remedies for past trespasses.

The failure of one partner in a ditch, to pay his proportion of the expenses of the concern, does not forfeit his right in the common property,

Kimball *v.* Gearhart.

This Court has often held that it would not interfere with the verdict of a jury, on the ground that such verdict is against the weight of evidence, except in extraordinary cases. It is almost impossible for an Appellate Court to satisfy itself in a decision upon such matters—so much depends upon the manner, bearing, character of witnesses, and the peculiar circumstances which the transcript fails to preserve, which give value and weight to testimony.

Where parties projecting a ditch to convey water, give notice to the world of their intention to dig such ditch and appropriate such water, in the usual manner, and mark out and designate the line of such ditch by the usual marks and indications, and pursue the work on the ditch with a reasonable degree of diligence until the same is completed so as to receive the water, they are entitled to such water as against all persons subsequently claiming or locating it.

In appropriating unclaimed water on the public lands, only such acts are necessary, and such indications and evidences of appropriation required, as the nature of the case and the face of the country will admit of, and are under the circumstances and at the time practicable—surveys, notices, stakes and blazing of trees, followed by work and actual labor, without abandonment, will in every case, where the work is completed, give title to the water over subsequent claimants.

The title to the water conveyed through a ditch constructed in such manner, will, on completion of the work, date back from the beginning of the work as against subsequent appropriators.

In determining the question of diligence in the construction of such a work, the jury have a right to take into consideration the circumstances surrounding the parties at the date of the appropriation, such as the nature and climate of the country traversed by such ditch, together with the difficulties of procuring labor and materials.

Where parties go to issue in actions for the diversion of water, upon general averments and denials of title, anything that legally supports or attacks the title, is admissible in evidence.

Possession or actual appropriation is the test of priority in all claims to the use of water, where such claims are dependent upon the ownership of the land through which the water flows.

The mere act of commencing a ditch with the intention of appropriating the water, is not sufficient of itself to give a party an exclusive right to the water of such stream.

The notice of the intention to appropriate the water, must be sufficient to put a prudent man on inquiry.

The doctrine of relation in the appropriation of water, only applies when the first acts, from which the party appropriating seeks to date his right, indicate the intention of appropriating such water.

Where parties commence the construction of a ditch, who have not at the time the pecuniary means requisite to complete the same in a reasonable time, and they project the work and claim the water with a full knowledge of their pecuniary inability to complete the same within a reasonable time, they cannot urge such want of means as an excuse for not prosecuting the work.

APPEAL from the Fourteenth District, County of Sierra.

This was an action for damages for the diversion of water from the ditch of plaintiff.

The facts are stated in the opinion of the Court, with the exception of certain instructions which were given by the Court to the jury. The instructions given by the Court, at the request of the plaintiff, are as follows :

" 1. If the jury believe that the plaintiffs did, in July, 1854, project a ditch to receive the water now in dispute, and did give notice to the world of their intention to dig such ditch and appropriate such water, in the usual manner, and did mark out and designate the line of said ditch by the usual marks and indications, and did pursue their work on said ditch with a reasonable degree of diligence until the same was completed so as to receive this water in dispute, then they are entitled to such water before all persons subsequently claiming or locating it.

" 2. If the jury believe from the evidence, and the admissions contained in the answer, that the plaintiffs took up and claimed the water in dispute before the defendants did, and that they constructed a ditch to receive such water, with due diligence, and that since the completion of said ditch they have been deprived of such water by the defendants, and since the thirty-first of July, 1856, the plaintiffs have had their ditch in a condition to, and could have used the water in the water season prior to the commencement of this suit, and have, during such time been deprived of the use thereof by the defendants, then they must find for the plaintiffs and assess the damages.

" 3. In appropriating unclaimed water on public lands, only such acts are necessary, and only such indications and. evidences of appropriation are required, as the nature of the case and the face of the country will admit of, and are under the circumstances and at the time practicable—and surveys, notices, stakes and blazing of trees, followed by work and actual labor, without any abandonment, will in every case, where the work is completed, give title to water over subsequent claimants.

" 4. If the plaintiffs surveyed the ground, planted stakes along the line, gave public notice by posting notices, or otherwise, and actually commenced and diligently pursued the work of the Yuba River Ditch,

Kimball *v.* Gearhart.

which was to take and receive the water in dispute, and if any of these acts were prior to the claim or location of defendants, this entitled plaintiffs to the possession and ownership of the water, and therefore the jury must find for plaintiffs.

" 5. If the jury believe that the plaintiffs, with the intention to appropriate this water, used reasonable diligence in following one step by another till the ditch was completed, their title to the water, though it was not perfected until the ditch was so far completed as to convey the water, will yet on completion date from the beginning of the work.

" 6. That in determining the question of the plaintiffs' diligence in the construction of their ditch, the jury have a right to take into consideration the circumstances surrounding them at the date of their alleged appropriation, such as the nature and climate of the country traversed by said ditch, together with all the difficulties of procuring labor and materials necessary in such cases.

" 7. The law does not require a vain or useless thing to be done ; that therefore the plaintiffs were not required by the law of due diligence, to complete their ditch before they could successfully use it for the purpose for which they dug it.

" 8. If the tunnel through the ridge was a necessary part of the plaintiffs' ditch, without which it could not be used, then it was only necessary for the said plaintiffs to complete their said ditch by the time they could, with reasonable diligence, succeed in preparing their tunnel for use."

To the giving of the foregoing instructions, the defendant excepted.

The following are the instructions given at the request of the defendant :

" 1. If the jury believe from the evidence that the plaintiffs had no ditch or survey for a ditch to the stream of water in dispute, and also that they had no notice or marks upon said stream, indicating an intention to appropriate it, at the time of defendants' appropriation of the water of the said stream, they must find for the defendants.

" 2. Possession or actual appropriation must be the test of priority in all claims to the use of water, whenever such claims are dependent upon the ownership of the land through which the water flows.

Kimball *v.* Gearhart.

" 3. The mere act of commencing a ditch with the intention of appropriating the water of a stream, is not sufficient of itself to give a party any exclusive right to the water of such stream.

" 4. Although plaintiffs or their grantors may have intended to appropriate the water in dispute, by means of their ditch commenced in 1854, yet, if they did not manifest their intention by such acts or in such a manner as would have notified a prudent man, about to appropriate said water, of such intention at the time defendants appropriated the same, the jury must find for the defendants.

" 5. The doctrine of relation in the appropriation of water, can only apply when the first acts, from which the party appropriating seeks to date his right, indicate the intention of appropriating such water.

" 6. If the jury believe from the evidence, that plaintiffs or their predecessors in interest, did not, after locating and surveying their ditch, prosecute the work on it in good faith, and as fast as the nature of the work and the state of the weather would reasonably permit, and that they had neglected the work upon it for an unreasonable length of time, immediately preceding the appropriation of the water in dispute by defendants, the verdict should be for the defendants.

" 7. If the jury believe from the evidence, that the plaintiffs at the time they commenced the Yuba River Ditch, had not the pecuniary means requisite to complete the same in a reasonable time, and that they projected the said work, and claimed the water in dispute with a full knowledge of their said pecuniary inability to complete the same within a reasonable time, then plaintiffs cannot urge such want of pecuniary means as an excuse for not prosecuting said work with reasonable diligence, and completing it within a reasonable time.

" 8. If the jury believe from the evidence, that the plaintiffs made an unreasonable delay after claiming the water in dispute, and that during such delay, and before the plaintiffs renewed work upon their ditch, defendants in good faith located and appropriated the water in dispute, they must find for the defendants.

" 9. If the jury believe from the evidence, that the defendants were the first appropriators of the water in dispute, in good faith and without notice of any prior claim of plaintiffs, they must find for defendants.

" 10. Even if the plaintiffs had located and claimed the water in dispute, in the year 1854, and prior to the appropriation of the same by the defendants, yet, if after making such location and claim, plaintiffs failed and neglected to renew or keep in existence such notice or such other evidence of their location and claim, as would have put a reasonable and prudent man, wishing to appropriate the water, on inquiry, and that in the absence of such notices or other evidences of said location or claim, the defendants located and appropriated said water in good faith for mining purposes, they must find for the defendants.

" 11. Kimball and others are plaintiffs in this action, and they must show a better title to the water in dispute than the defendants have, before they can recover, and the burthen of proof is on the plaintiffs to show that they are entitled to the water in dispute."

To the giving of which instructions so requested by the defendants, the plaintiffs excepted. The substance of the instructions refused by the Court, appear in the opinion of the Court. Defendants had verdict and judgment.

Plaintiffs moved for a new trial, which was denied, and they appealed to this Court.

*Mc Connell & Niles and H. I. Thornton, jr.*, for Appellants.

We ask the reversal of the judgment in this case upon the following grounds, viz :

I. The Court below erred in ruling out the deposition of Charles R. Howe, as evidence at the trial of said cause.

II. The Court erred in refusing to set aside the verdict of the jury in said cause, and grant a new trial upon the following grounds :

1. Insufficiency of the evidence to justify the verdict rendered by the jury.

2. Error in law, occurring at the trial, and duly excepted to by the plaintiffs.

3. The verdict is contrary to law and evidence.

III. The Court erred in refusing the instructions asked by plaintiffs, numbered 7, 8 and 9 ; and in giving those asked by defendants, numbered from 1 to 11 inclusive.

I. The first point assigned for error consists in the ruling out of the deposition of Charles R. Howe.

The ground of the exclusion of the deposition was the existence of Howe's alleged interest in the damages for the eighteenth of July, 1856. It was said that the record in the present action might be evidence for or against him in any suit he might hereafter institute for such damages.

The water right or easement alleged to have been disturbed and injured, pertains to a certain ditch situate on the public land, called the "Yuba Ditch."

This ditch was projected in May, 1854.

As shown by Howe's preliminary examination, Harlow Kimball and himself were the original projectors of such ditch.

The statement made by Howe, and relied on by defendants, is substantially as follows :

In May, 1854, Kimball and himself conceived the project of constructing the ditch mentioned in the complaint, to bring in the water of the North fork of the North Yuba river, and its tributaries, to Eureka and vicinity.

Howe had no pecuniary means nor credit, and Kimball assumed the burthen of advancing all the funds immediately necessary—with the understanding, however, that Howe should hereafter advance his share of the cost and expenses—and that he should then have an interest commensurate with his advances. In the meanwhile Howe was to devote his time and labor to the construction of the ditch, etc.

Two years passed—the ditch was near its completion—and still Howe had not contributed a single cent towards its cost.

In the meanwhile, Kimball became deeply involved in debt to Johnson & Hickok for money and material advanced by them *upon his credit* towards the construction of the work.

It became absolutely necessary that Howe should comply with the condition of his arrangement with Kimball, and advance a part of the money, or that he should suffer his estate to be determined, and back out of the enterprise *in toto*. He chose the latter, and conveyed to Kimball, on the nineteenth of July, 1856, and on the same day Kimball conveyed to Johnson & Hickok, two-fifths of the whole enterprise.

The two transactions were in fact but parts of the same transaction, as Howe's evidence shows.

Howe, in his deed to Kimball, quit-claimed to him *one-half* of the whole work, because his interest *might* have amounted to a half had he complied with his original agreement, and advanced the necessary money.

Now mark the terms of this whole arrangement so far as Howe is concerned :

Although, as a matter of form, a sum is named in the deed as a consideration, yet in point of fact he received not a cent by way of consideration, properly so called.    But from his own statement it appears that the only advantage he derived from the transaction was, first, a release from all liability to Johnson & Hickok by reason of the indebtedness to them ; and secondly, he was to receive from Kimball, and Johnson & Hickok, compensation for all the labor and care he had bestowed upon the work, *from its very commencement*, at the rate of seven dollars per day.

Now the question recurs upon the nature of Howe's estate or interest before the nineteenth July, 1856, and what effect the transactions of that date had upon it.

In the first place, we admit that Howe had such an interest before the nineteenth of July, 1856, as would disqualify him as a witness in any action *instituted before that date.*    But that is a very different question from the one presented by the record.

It is evident that Howe occupied towards Kimball and the enterprise one of the two following positions, viz : first, at the commencement of the ditch, he had an interest *in presenti*, subject to be defeated by a future contingency, viz., the nonpayment of his proportion of the cost, or, secondly, he may be regarded as having at the beginning of the enterprise only an inchoate right, capable of ripening into a vested interest *in futuro*, upon the happening of a certain contingency, viz., the payment of his part of the cost.

Assuming the first hypothesis to be correct, we lay down this proposition :—upon the happening of the contingency upon which his estate depended, he became divested of such estate *retroactively*, and his title thereto, as well as all of its incidents, became as if they had never existed.

Kimball *v.* Gearhart.

In this respect it resembles more nearly than anything else an estate upon condition, created by deed. It is true there was no deed in this case, but the parties originally stood in the same position towards the property, and there was a contract or agreement between them, the final execution of which depended upon a condition. One other point of difference is to be found in the fact that a deed conveying an estate in lands, etc., operates upon property having a present existence, whereas in our case the original agreement or understanding between Howe and Kimball was to operate upon property to be created by their future joint efforts. But this difference evidently tends to establish the propriety of our attempt to apply the law of " estates upon condition " to cases like the present.

The rule in relation to estates upon condition is, that when the estate is divested by the failure of the grantee to perform the condition, it operates retroactively ; and while the grantee, or feoffee on condition, is supposed in law never to have had an estate, the grantor shall enter as of his old title, and shall be regarded as having been all along the owner of the property. Coke on Litt., 202 (a) ; Bac. Abr. title *Condition*, vol. 2, p. 316 ; 1 Hilliard on Real Property, p. 369 ; 4 Kent's Com., sec. 123—127.

Again : ditch property itself is subdivided into two distinct kinds or species of property, one of which is dependent upon the other. They are—*first*, the ditch, canal or flume ; and *secondly*, the water right, privilege or easement.

Either of these may be injured, and the owner may have a remedy for such injury, specially appropriate to the nature of the property, and the nature of the injury. If his ditch be cut or filled up, he may bring trespass founded on his possession. If his water right be disturbed, he may bring case founded on his title or property.

There is no averment or pretense of any injury having been committed to their ditch or other corporeal property. The gist of our action is the diversion of water which we had a right to divert from its natural fountain or stream, thereby preventing a diversion of the same water by us.

The action is founded upon the plaintiffs' title, or upon their ownership of the incorporeal hereditament or easement.

To enable Howe, therefore, to maintain an action for such an injury after the nineteenth of July, 1856, it is necessary that he should have been one of the owners, not only of the ditch, but of the water right or easement, before that period; and also, that his estate or interest should not have been retroactively divested.    This is evident.

If Howe sold his share before the completion of the ditch and appropriation, then, even if his share had been fixed and definite from the first, it would not be regarded as extending to the easement, but merely to the part of the ditch completed at the date of the sale.

These principles are so obvious and so fully sustained by reason, that we deem it unnecessary to quote authority in support of them.    We content ourselves with a general reference to the following cases: Kelly v. The Natoma Water Co., 6 Cal. Rep. 105; Couger et als. v. Weaver et als., Ibid, 548; Simpson v. Eddy, 3 Cal. Rep., p. 249; Irwin v. Phillips, 5 Cal. Rep. 140.

But, it will be asked, how does all this affect the case at bar, since the complaint itself shows that plaintiffs' appropriation was prior in date to the nineteenth July, 1856, when Howe sold to Kimball?

In answer to the question we say, that taking into consideration the nature of the property, in connection with the facts disclosed by Howe's evidence, we fully establish the correctness of our position, that Howe never had a legal estate in the property, but a mere right, which might at some future time ripen into an estate.

For, granting that we are right in the assumption that neither Kimball or Howe had a vested estate in the easement until actual diversion, and granting further the truth of Howe's statement that the extent of his share was to depend on his future contributions, the following conclusions seem to follow inevitably, viz: Upon the completion of the ditch and the diversion of the water, the *water right* became vested in the projectors jointly, or rather, perhaps, as tenants in common, in proportion to the amount advanced by each.

Inasmuch, however, as Howe had advanced nothing, no share vested in him; so that on the nineteenth July, 1856, he had no interest in the ditch or easement, and of course could not demand of defendants to make amends for the damages.

It will be perceived that our reasoning altogether pretermits the fact

Kimball *v.* Gearhart.

that Howe worked on the ditch from its first commencement till its completion. The reason for this is twofold—1st. Because we infer from Howe's statement, that the contribution of each of the adventurers was to be in money or its equivalent in materials. The very object of this contribution of each of the adventurers was to employ laborers. 2d. Because he was compensated for his labor in a way entirely inconsistent with the idea of his receiving a share of the ditch for it, viz., by receiving seven dollars per day for it, for the whole time he was engaged. By accepting this sum as compensation for all his rights, Howe estopped himself from saying either to his co-adventurers, or to a mere stranger, that he ever had an interest, or that he was entitled to recover damages from them for any act done either before or after such acceptance.

Upon this reasoning, we think it clear that the deposition ought to have been admitted in evidence, and that his Honor erred in excluding it.

II. The Court erred in refusing to set aside the verdict and order a new trial.

This motion was predicated on several grounds; the principal of which were " that the verdict was contrary to evidence," and " error in law occurring at the trial, and excepted to by the plaintiffs."

We contend that the verdict was contrary to the evidence.

We are aware of the great unwillingness of the Court in ordinary cases to interfere with the verdict of a jury, or with the action of a *Nisi Prius* Court in sustaining such verdict. Nothing in our opinion can be more laudable than this spirit in an Appellate Court.

But cases must often arise, and we know have arisen in our State, where the ends of justice imperatively demand the exercise of this Court's undoubted prerogative to supervise the verdicts of juries, and set them aside, if in conflict with testimony. O'Keefe *v.* Cunningham, 9 Cal. Rep., p. 589; Bagley *v.* Eaton, 8 *Ibid*, 159; 9 *Ibid*, 430; Same case, July Term, 1858. The case at bar, we think, is one of these cases.

(Counsel here reviewed the evidence at great length.)

III. The Court erred in refusing instructions numbered 7, 8 and 9,

offered by plaintiff, and in giving the instructions numbered from 1 to 11 inclusive, offered by the defendants.

It would be somewhat difficult to ascertain his Honor's objections to these instructions, had he not himself informed us.

As regards the first, (No. 7) he objects that it is not predicated upon the evidence, as it was not shown that the plaintiffs acquired any right to the disputed water in 1854.

His objection to our position that *abandonment* is a special defense, and must be specially pleaded, is that we should have objected to the introduction of any proof of abandonment if it was not warranted by the pleadings, etc.    He then proceeds to remark that he fully explained the doctrine of *relation* to the jury, etc.

Now it seems to us that it is upon this very doctrine of relation that we differ from the learned Judge.    He says there is no proof that we acquired any rights, etc., in 1854.    But we say, that according to the very doctrine of *relation* mentioned by him—if we commenced our operations to divert the Sebastopol water in 1854, and completed them in 1856—our acquisition of the easement relates back and dates from the year 1854 ; that is to say, by construction of law we are supposed, as against all subsequent intruders, to have acquired our right in that year.    Kelly *v.* The Natoma Water Co., 6 Cal. Rep., p. 105 ; Barnes *v.* Stark, 4 Cal. Rep., p. 414.    See also, Viners' Abr., title *Relation ;* Jackson *v.* McCall, 3 Cowen Rep., p. 80 ; Jackson *v.* Bull, 1. Johns. Cas., p. 81 ; Jackson *v.* Raymond, *Ibid,* p. 85, note ; Case *v.* De Goes, 3 Caine's Cas., p. 262 ; Jackson *v.* Bard, 4 Johns. Rep., p. 234.

In Heath *v.* Boss, a patent for land dated the fourth of December, but which did not pass the great seal until the twenty-eighth, was held to relate back so as to vest the title in the patentee from the date.    12 Johns. Rep., p. 140.

The authorities are quite numerous, but the above will suffice.

The true import of the doctrine of *relation* being established, no one will deny the legal propriety of the instruction.    It merely reiterates the well known rule, that the existence of a right being shown, its continuance will be presumed, and that the burthen of disproving its present existence is with those who deny it.

Kimball *v.* Gearhart.

The other point of difference between the Court and ourselves is upon a mere question of fact.  He says we ought to have objected to the defendants' evidence of the plaintiff's abandonment; thereby implying that evidence was offered by the defendants expressly to prove abandonment.

Now, as a matter of fact, no such evidence was offered.

All the evidence offered by the defendants was admissible in some point of view.  No evidence was offered avowedly for the purpose of showing an abandonment.  What we objected to was the attempt of the defendants to infer from the general circumstances and history of the case abandonment by the plaintiffs, and to impress such inference upon the jury.  In our 9th instruction we distinctly affirm that the defendants must plead an abandonment by the plaintiffs, and *prove* it; which we would scarcely have said, had the defendants actually introduced such proof.  Our point was, that the defendants were trying to avail themselves of an abandonment on our part without having pleaded or proved it.

Instructions are frequently asked for no other purpose than to refute the erroneous position of counsel, when it is apprehended that their error may be imposed upon the minds of the jury.  And our instruction could be sustained upon this ground, if on no other.

An abandonment, properly so called, can only be voluntary.  But there are cases where a *non user* for a given period will·be regarded as tantamount to the expression of a determination to abandon.  It is this latter sort of abandonment which bears so striking a resemblance to a forfeiture; for in ninety-nine out of every one hundred instances of abandonment by *non user*, the will does not in fact consent.  3 Kent's Com., secs. 448, 449, 450.

All authorities concur in holding that a right can only be lost by *non user* where the *non user* extends over a period sufficient to vest a title by prescription.   Domat's Civil Law, sec. 1030; 3 Kent's Com. sec. 448; Lawrence *v.* Obee, 3 Campbell, 514; Corning *v.* Gould, 16 Wend. 513; Yeakle *v.* Nace, 2 Wharton's Rep. 123.

The same principle has been applied by this Court to water privileges on the public lands, and to mining claims.   Crandall *v.* Woods, 8 Cal. Rep. 136; Partridge *v.* Townsend *et als.*, July Term, 1858.

The latter case is exactly in point.

The Civil Law in this respect agrees literally with ours. Indeed it seems to be taken for granted, that our law of easements and servitudes was derived from the Roman Law. Domat's Civil Law, sec. 1030, *et seq.*

The principle has often been applied to offices and other franchises.

From the various reported cases the following rule of procedure may be adduced :

When a man holds a right or franchise of a public nature, and it is alleged that he has abandoned it by *non user*, the fact can only be definitely ascertained and adjudged by a judicial proceeding in which the question is directly involved. Hardin *v.* Page, 8 B. Monroe, 648.

*Vanclief & Stewart* for Respondents.

The witness Howe sold out of the ditch on the nineteenth of July, 1856.

The damages are claimed for about one year of the time while Howe owned one-half of the ditch. His right to these damages he did not sell with his interest in the ditch, and could not if he would. Oliver *v.* Walsh, 6 Cal. 456.

Under these circumstances, he was clearly incompetent by the rule in Packer *et al. v.* Heaton *et al.,*     Cal.

A very metaphysical argument is based to prove that Howe was not interested in the damages at the time his deposition was taken—June 30th, 1858.

By a careful perusal of Howe's examination on his *voir dire*, it will be seen that the circumstances of his connection with the ditch enterprise were about as follows :

In May, 1854, Kimball and Howe conceived the project of constructing the ditch described as the Yuba Ditch. No understanding was then had between them as to what proportion of the ditch, when completed, should belong to each.

Howe gave his personal attention and labor, and Kimball furnished all the money that was furnished.

But nearly everything except what was done by Howe, was done on a credit extended to them mostly by Johnson & Hickok. They went

on in this way, without any agreement or understanding between themselves, till July, 1856, one year after the completion of the ditch to the water in dispute, when they got into difficulty with the defendants about this water.

Howe and Kimball were by this time indebted to Johnson & Hickok for means advanced to carry on the work, in the sum of about ten thousand dollars.

On the nineteenth of July, 1856, Howe sold to Kimball his entire interest in the concern, describing it as *one-half*. The consideration of this sale is stated by Howe to have been that he should receive a sum equal to seven dollars for each day he had worked on the ditch ; that he should be furnished work on the ditch for the future at the same rate, and that he should be discharged from all liabilities formerly incurred, and particularly from all liability to Johnson & Hickok, which was their principal, if not their only liability.

For the purpose of discharging this liability, it was arranged at the same time that Kimball should convey to Johnson & Hickok two-fifths of the ditch ; for it seems that Kimball was at this time as destitute of means as Howe, and that neither could pay in any other way than by selling a portion of their ditch.

There is no evidence that the interest of either Howe or Kimball was to terminate on the failure of either to pay his portion of the expenses, nor that the quantity of either of their interests should be regulated by the sum paid into the concern by either of them.

Howe never did hold his interest under Kimball in any way. He was the first to discover the water and the route ; the first and the last to work upon it. There were no conditions attached to his tenure which might not with equal propriety be said to have attached to that of Kimball.

They both acquired and held (till Howe sold out) the same character of title.

It is true that neither of them acquired such a right to the use of the water in dispute, as would enable them to maintain an action for the diversion of it, until their ditch was capable of receiving it.

The ditch was so completed, according to their testimony, in August, 1855, nearly one year before Howe sold out ; during all which time

3

plaintiffs claim damages, and have a right to recover for that time, if at all.

A condition upon which a forfeiture can be based, must be the subject of an *express* contract. Here, then, is no contract with a condition either express or implied.

An entry by the grantor or feoffor for condition broken, implies a grant or feoffment *on condition.* In this case, there is no grant or feoffment on condition, or otherwise.

Howe did not derive or hold his title from or under Kimball in any manner known to the law. Kimball never had any *"old estate"* in Howe's share of the property; how, then, could he "be in as of his old estate ?"

For the purpose of making their theory fit the facts of this case, the learned counsel deny that there was any valid conveyance from Howe to Kimball *for want of any consideration."*

We think there was a good consideration. Howe's discharge from their joint liability to Johnson & Hickok for ten thousand dollars, was something very much resembling a consideration. Seven dollars per day for all the time he had worked, when wages were only four dollars, might be taken for some part of a consideration, especially when according to the theory of counsel, Kimball was under no legal obligation to pay anything for his past labor.

The other position assigned to the witness Howe is, that he never had any vested interest in any portion of the property, for the reasons that by the original agreement his interest was to be only in proportion to the amount contributed by him to the joint concern, and that he never contributed anything, and therefore had no interest.

In answer to this it is only necessary to say, first, there never was any such agreement, and the record will not show it.

Howe could not assign his interest in the damages. Oliver *v.* Walsh, 6 Cal. 456.

And, being interested in a part of the damages claimed, he was incompetent. Packer *v.* Heoton, 9 Cal. 571 ; Gage *v.* Stewart, 4 John. 293.

The second point made by appellant is, that the evidence does not justify the verdict of the jury.

(On this point counsel for respondents also went into a lengthy dis-
cussion of the facts.)

We are referred to the case of Couger *v.* Weaver, for authority to
set aside the verdict of the jury in this case. All that was decided in
that case was, that this Court would not disturb the verdict when there
was any evidence to sustain it. That is all we ask in this case.

This Court will not disturb a verdict where the evidence is conflict-
ing. Had the verdict in this case been for plaintiffs, their evidence
might sustain it, though we do not doubt that the preponderance of
evidence is with the defendants.

The third error relied on is the refusal of the District Court to give
the instructions numbered 7, 8 and 9, asked by appellants.

Number 7 was properly refused, because there was no evidence
tending to show that plaintiffs acquired any right to the water by any-
thing they did in that year; for by their own showing, they could not
have appropriated the water before August, 1856; and if their right
was to be dated back to 1854, it must have been by virtue of the law
of relation which had been fully explained to the jury in the instruc-
tions given. It was also bad, for the reason that the issue of " aband-
onment " had not been made before the jury either in the pleadings
(as contended by counsel) or the argument to the jury.

It is admitted that the issue of abandonment was not made by the
pleadings, and that all the evidence was proper under the pleadings.

Why, then, an instruction on that question required, unless it had
been claimed by defendants, that there was such an issue ? which was
not the fact. The questions made to the jury, as before stated, were
as to plaintiffs' intention to take up the water before defendants appro-
priated it; and if so, had plaintiffs followed up that intention with due
diligence, or such acts as would, with them, date back their right
by relation ?

Number 8 was properly refused, for the reason that it was calculated
to mislead the jury. It was competent for defendants to plead prior
location, and prove it by showing the time of their location, and rebut-
ting plaintiffs' location in 1854, by showing that they had not used
such diligence as would entitle them to date their right back by rela-

tion to that date.   All this could be done, and was done, without rais-
ing the issue of *abandonment.*

But we will here remark, that we know of no rule which would
require abandonment in a case like this to be pleaded specially.   The
plaintiffs have not specially set out in their complaint the circumstances
on which they intended to rely to establish their right, and it may well
happen that defendants would have no notice of them till they were
introduced in evidence.

Number 9 is subject to the same objections as 7 and 8.

Appellants also assign as error the giving of defendants' instructions
from 1 to 11 ; but as they have not attempted to point out the error,
we are not required to notice them.

BALDWIN, J., delivered the opinion of the Court—TERRY, C. J.,
concurring.

This is an action for the diversion of water, and the main question
was the privity of appropriation.   On the trial the plaintiffs offered
one Howe as a witness.   He was sworn on his *voir dire,* and upon the
facts stated by him on his examination, was objected to as incom-
petent because interested, and excluded by the Court.   The correct-
ness of this ruling is impeached by the appellants, and is the first
error assigned.   The facts which determine this question of the interest
of the witness are these :   Witness was, in 1854, an owner in the
Yuba Ditch Company, in respect to the water of which this suit is—
in 1854 till 1856—was also an owner in a ditch called the Kimball
Ditch, from July, 1853, till August, 1854 ; sold his interest in the
Yuba River Ditch Company to Harlow Kimball ; the witness' interest
in the Kimball Ditch was sold by the Sheriff; sold interest in the Yuba
Ditch Company in July, 1856—latter part of it ; don't know exactly
the date.   Being asked as to the extent of his interest in the Yuba
Ditch, the witness stated:   " We were partners, and took up the
water ; I owned one-half of it then ; that was what I supposed when
we took it up ; I sold my whole right then ; I could not tell how much
I did own, for I never had paid a cent on it."   " There was a dispute
about the water of the Yuba Ditch, or a part of it, when witness sold ;
made a deed to Kimball, when he sold it ; was paid for it ; was paid

by note about first of April, 1858, between first and fifteenth; took no mortgage or other security. Being asked how he came to settle and take the note just before the trial in this suit, in April, 1858, answered: "I was not able to go on with it, and I told them if they would pay me seven dollars per day I would take it and release them, and have no claim on the ditch; bargain made with Harlow Kimball; the note given, witness supposes, was to enable him to testify; Kimball, Johnson and Hickok gave their notes; Kimball sold to Johnson and Hickok two-fifth interests the day witness sold to them; never had a settlement from the commencement of the ditch; they were owing witness $1,000; claimed to hold the ditch for his debt—for work on it; never been paid a dollar; Kimball and Hickok told me to bring in account, and they would settle it." On cross-examination, witness said: "In April, 1858, was not interested then or after the deed was made. No other interest than the claim for this money; no mortgage or other security for this money; the deed of the Yuba Ditch Company to Kimball was made for the purpose of Kimball's transferring a portion of witness' interest to Johnson and Hickok for heavy indebtedness due from witness and Kimball as owners of the Yuba River Ditch. Kimball, at the time witness transferred to him, transferred two-fifths of this ditch to Johnson and Hickok, and they canceled all the indebtedness due from witness and Kimball; sold out all his (witness') right, because witness was in debt on it, and could not go on with it"—"was it understood that both were to be responsible for debts? thinks things got were charged to Kimball. Witness never paid anything; Kimball paid all that was paid; witness had ran behind all the time. When we first took the ditch my share was one-half, and when it ran behind I never could exactly know what it was; deeded to Kimball one-half; did it to cover the greatest interest witness ever had; the deed to Kimball and from Johnson and Hickok all parts of the same transaction; so understood to be beforehand; was to give witness seven dollars a day for all the work witness had done from the commencement, and to assume the debts."

The deposition of the witness was taken, and tended to prove facts material to the issue in support of the plaintiffs' action. This deposition being offered by the plaintiffs, was objected to by the defendants

upon the showing made on the *voir dire,* and also for another reason, which it is not necessary to consider, as it is embraced in the answer of the witness. The plaintiffs offered in rebuttal an entry made in this case at the April Term, 1858, to this effect: " On motion of plaintiffs' attorneys it is ordered, that plaintiffs have leave to strike from their complaint their claim for damages previous to July 19th, 1856—the date of Howe's deed to Kimball." But no amendment to the complaint in this respect seems to have been made. The plaintiffs also offered a paper in these words: " The plaintiffs in the above entitled cause release and remit to the defendants in said cause all claim and demand for damages contained in their complaint for the whole of the month of July up to the first day of August, A. D. 1856.

(Signed)                                     KIMBALL & CO.

By their Attorneys, H. I. THORNTON, Jr., and J. R. McCONNELL."
And filed it among the papers in the cause.

The declaration is for damages for the diversion of water for 1855 and succeeding years.

It is unnecessary to consider these matters subsequent to the taking of the deposition which was introduced to give it effect. The mere order permitting an amendment of the complaint was of no effect unless and until complied with. The release or remittitur was of no force, even if the attorneys at law signing it had any legal authority to execute it, which, to say the least, is extremely questionable: for the plain reason that to make the testimony of the witness admissible, he must have been competent at the time of the taking of his deposition. It is of no importance that he is competent afterwards, as it is the effect of the interest on the witness which disqualifies him. Whether he was interested or not depends on the issue; that issue, in this case, upon the pleadings, was the title to damages arising from a diversion of water before 1856; and this question, of course, depended upon the ownership of the water, such ownership following from the fact of prior appropriation. The question of interest then rests on this: Would the witness have gained or lost by the verdict?

Kimball *v.* Gearhart.

It seems that he and Kimball were joint owners before the date of the deed to Kimball, in July, 1856. For an injury to or an appropriation of the common property, while they were such joint owners, *these owners* were entitled to damages. If a recovery had been had by one, the benefit would have resulted to both. The partner or tenant in common would have held these damages in trust for both, just as if the defendants had voluntarily paid the amount of these damages to one of these owners. The sum so paid would have been the property of both. The subsequent deed to Kimball, though it carried the property and the future use of the water, did not retroact and carry the right to damages for the past illegal use of it, any more than a deed to land carries the remedies for past trespasses. An ingenious argument is made by the appellants' counsel to show that by the failure of Howe to pay his proportion of expenses, the estate he had was forfeited as on a condition subsequently broken, and that all remedies and rights touching the estate, by relation, attach to the other party. We are unable to see the force of the argument. It is equally unfounded in law and in fact, for here there was no original, independent estate in Kimball; he made no deed or contract on condition subsequent. If not estopped by the deed from Howe to deny Howe's title, the facts sufficiently show, notwithstanding his not very satisfactory explanations, that Kimball and Howe were partners in this adventure, with equal rights in the subject of it, and it is evident that the mere failure of one partner to pay his proportion of expenses, or of the debts of the concern, does not forfeit his rights in the common property. We think, in the aspect in which this witness presented himself, it is the case of one partner suing for an injury done to the firm property, and calling the other as a witness to prove his case.

The argument founded upon the peculiar nature of this property is more subtle than sound. It is true that the mere right to water is a sort of incorporeal thing; but the water itself is substantial and tangible, and as the right gives the control and possession of this commodity, and entitles the party to damages for its diversion by another, we do not see why this right may not be acquired by two or more acting together, or why, when they do acquire it, they do not hold it as other property, and may not sue as such for any unlawful interference with it.

The Court, therefore, did not err in excluding this deposition. Nor do we see in the statement of this witness, when properly construed, any evidence of abandonment. Howe and Kimball acquired this property as partners; for a sufficient consideration one relinquishes to the other his interest in the joint property. The nature of the property has no effect on the transaction. It is the common case of a bargain and sale by one partner to another, none the less partaking of the nature of a bargain and sale, because the selling partner was indebted to his associate on account of the firm business, and, for this purpose, makes the sale.

The next question is, whether the verdict is so clearly against the weight of evidence, that we are called upon to reverse the judgment of the District Court before whom it was given, and grant a new trial? This Court has so frequently held that it would only interfere in extraordinary cases with the decisions of the lower Courts in this respect, that it is useless to repeat the rule laid down. It is almost impossible for an Appellate Court to satisfy itself in a decision upon such matters—so much depends upon the manner, bearing, character of witnesses, and the peculiar circumstances which the transcript fails to preserve, which give value and weight to testimony.

The main question was as to the priority of location of this ditch, and this depended very much upon the general fact whether the plaintiffs had done such acts in 1854 as would, in August, 1855, when they completed their ditch to the water in dispute, entitle them to invoke the doctrine of relation, and get in, in advance of the actual appropriation of the water by the defendants; and upon this question there was no little conflict in the proofs. The conflict is in respect to the dates and character of the particular acts from which the appropriation is inferred. If there were no other circumstances of conflict than those contained in the testimony of James as to the time of marking the trees, this would, perhaps, be sufficient to be left to the jury for them to determine the weight and effect of the proofs. But there are various other matters of more or less weight, such as the admissions of Howe and the like.

The points made by the appellants question the propriety of certain instructions given, and of the refusal of other instructions asked.

A large number of instructions were given by the Court, and several refused. Those given are expressed with great clearness and precision. They embody the law as ruled by this Court, and propositions necessarily resulting from those settled heretofore. Several instructions were refused by the Court. They are marked seven, eight and nine of the list of those asked for by the plaintiff. The seventh instruction was to this effect: That if the plaintiffs did, in the *Summer of* 1854, acquire a right to the water in dispute, then the law presumes they retained the right so by them acquired, and the burthen of proving an abandonment on their part is with the defendant. This was refused, because there was no testimony showing that in 1854 the plaintiffs had acquired any such right. The instruction, as it stood, was at least ambiguous, and calculated to mislead. The right of the water did not, in strictness, accrue until the completion of the ditch—though the initiatory steps in 1854 might, by force of the subsequent event, have given title as against a subsequent appropriation from 1854, if done in that year. But this general language, though proper in some sense, was calculated to convey a wrong impression, as the jury might have inferred that these acts, of themselves, gave a right to the water. When the Court gave its reason for withholding the instruction, the appellant, if he desired the charge as to the abandonment to be given to the jury—for the Court had fully instructed the jury as to the other portions asked — should have removed this objection to it. Indeed, it is not clear that the whole substance of the legal portion of this charge had not already been given.

The eighth and ninth instructions are, in substance, that the jury should not regard any proof offered of abandonment, inasmuch as no such defense as abandonment is specifically set up in the answer. The complaint is general, not setting forth the character of title, or the facts constituting the title of plaintiff. It avers, in general terms, that " on or about the month of July, 1854, the said plaintiffs and their predecessors claimed, located, appropriated and became the owners of, and became entitled to the possession, use and enjoyment of, for mining purposes, the water and waters flowing," etc. The answer denies this general averment. Thus is put in issue the very question of title, and this involves necessarily the due prosecution of the work after the

appropriation, or, in other words, after the indication by some palpable and unequivocal outward sign of the intent to appropriate.   The title to the water does not arise, as we have intimated before, from the manifestation of a purpose to take, but from the effectual prosecution of that purpose.   This prosecution, therefore, is a necessary element of a title, and the negation of this, the abandoning of the purpose, is not so much matter in avoidance of a title; as it is matter showing that no title was ever obtained.   Besides, if parties go to issue, in actions of this kind, upon general averments and denials of title, we think that anything that legally supports or attacks the title is admissible in evidence, and may be applied by the jury to sustain or defeat it.

The other instructions are not liable to serious objection.   Indeed, we may remark that all the instructions given by the Court seem not only prepared with remarkable care, but that they present, with extraordinary clearness and accuracy, the various questions of law, bearing on the case, to the jury.

The judgment is affirmed.