[L. A. No. 1117.   Department Two.—December 1, 1903.]

# N. RICHEY et al., Appellants, ᴠ. EAST REDLANDS WATER COMPANY et al., Respondents.

WATER COMPANY—WATER CERTIFICATES IN OTHER COMPANIES—CONSTRUCTION OF RESOLUTION.—A resolution of a water company providing that upon receipt by it of one water certificate regularly issued on stock of each of two other water companies named, and on payment of twenty dollars, "one share of stock in this corporation" shall be issued, "the water represented by the same to be used upon the land in East Redlands of the person to whom said share is issued, the water represented by said share to be delivered at the highest corner of the land whereon the same is to be used," cannot be otherwise construed than as meaning that each share of the water company's stock represented a proportionate part of all the water of the company, and the words "water represented by the same," must be regarded as referring, not to the shares turned into the company, but to the share of stock issued by it.

ID.—CONFIRMATION OF CONSTRUCTION—LIABILITY, EXPENSE, AND BENEFIT OF STOCKHOLDERS.—Such construction of the resolution is confirmed by the liability of each stockholder assumed by the contract of subscription for his proportion of the debts of the defendant corporation and of the aggregate expenses of the water system, and by his presumptive right to a corresponding share of its profits or dividends; and also by the fact that the extra expense of the shares of one of the other water companies was incurred by all of the stockholders of the defendant company, and cannot be supposed to have been incurred for the exclusive benefit of part of them.

ID.—EQUAL RIGHTS OF STOCKHOLDERS.—In the absence of provision to the contrary in the certificates of stock of a corporation, or in its resolutions, by-laws, or charter, or other writing, the stockholders are to be regarded as equal in right.

ID.—USE OF DISTINCT WATER CERTIFICATES ON DISTINCT LANDS—RESOLUTIONS—CONTRACT RIGHTS.—The habitual use by the defendant water company of the water certificates acquired from one of the other companies on lands below its canal, and those acquired from the other company at greater expense on lands above the canal, and the resolutions of the defendant making such distinct use exclusive, cannot preclude stockholders on lands below the canal, whose supply of water has failed, from asserting their contract rights to a proportionate share of the whole water owned by the defendant.

ID.—ADVERSE USER—ESTOPPEL.—The use of the water delivered to some stockholders cannot be regarded as adverse either to the other stockholders or to the company. Nor could the stockholders, whose lands were below the canal, have any right to complain, so long as they were supplied with the amount of water to which they were entitled; and they are not estopped by acquiescence from assertion of their right to their proportionate share of water, which the company had ceased to supply them.

APPEAL from a judgment of the Superior Court of San Bernardino County and from an order denying a new trial. John L. Campbell, Judge.

The facts are stated in the opinion.

Otis & Gregg, and Charles E. Truesdell, for Appellants.

Stockholders are presumed to have an equality of right where the contrary is not expressly provided for. (1 Morawetz on Corporations, sec. 279; Taylor on Corporations, secs. 31, 32, 448, 458; *Plimpton* v. *Bigelow,* 93 N. Y. 592; *Burrall* v. *Bushwick R. R. Co.,* 75 N. Y. 211-216; *Kent* v. *Quicksilver Mining Co.,* 78 N. Y. 159; *Jermain* v. *Lake Shore etc. R. R. Co.,* 91 N. Y. 483-492; *Field* v. *Pierce,* 102 Mass. 253-261; *Fisher* v. *Essex Bank,* 5 Gray, 373-378.) There was no adverse user. (*Ball* v. *Kehl,* 95 Cal. 606, 613.)

Frank W. Burnett, *Amicus Curiæ,* also for Appellants, cited as to equal rights of stockholders, 1 Morawetz on Corporations, sec. 305, and on the question of estoppel, *Anaheim Water Co.* v. *Semi-Tropic Water Co.,* 64 Cal. 185.

E. R. Annable, for Respondents.

Irrigation rights established by a user of ten years should not be disturbed. (Civ. Code, sec. 552; *Merrill* v. *Southside Irrigation Co.,* 112 Cal. 426.) There may be preferred stock in a corporation. (*Kent* v. *Quicksilver Mining Co.,* 78 N. Y. 159.) The equities of the case, and understanding of the parties, should be considered. (1 Morawetz on Corporations, secs. 229-232; *Chater* v. *San Francisco Sugar Refining Co.,* 19 Cal. 220; *Shorb* v. *Beaudry,* 56 Cal. 446; *Cornell* v. *Corbin,* 64 Cal. 197; *Kohl* v. *Lilienthal,* 81 Cal. 378; *Behlow* v. *Fischer,* 102 Cal. 208.)

SMITH, C.—Appeal from a judgment for the defendants and from an order denying the plaintiff's motion for a new trial. The plaintiffs are stockholders of the defendant corporation, which was organized in the year 1886 for the purpose of supplying lands of its stockholders with water. The other defendants are three of the directors and the zanjeros of the company. The lands in question are subdivisions of a tract of land near Redlands, in the county of San Bernardino, known as the "Chicago Colony Tract," which, it should be understood, lies on a slope looking to the north—the highest point being the southeast and the lowest the northeast corner. The tract is supplied with water by two irrigating ditches, of which the one runs along the southern or upper boundary of the tract, the other across it, from the southeast to the northwest corner. The latter—which is known as the Bear Valley ditch—divides the tract into two nearly equal portions; the upper (exclusive of streets) containing two hundred and fourteen acres, the lower two hundred and nineteen. The aggregate of four hundred and thirty-three acres corresponds to the number of shares of stock of the company originally issued; which is all the stock outstanding, except ten shares subsequently issued, which need not be further considered. From the organization of the company, the lands lying below the Bear Valley ditch have been commonly supplied from it with water, and the lands above it from the upper ditch. Under this arrangement, until the year 1898, all the lands of the stockholders were sufficiently supplied, but in that year the water in the Bear Valley ditch began to fail and soon altogether ceased. Thereupon the plaintiff, whose lands lie below that ditch, demanded of the defendants to be supplied from the upper ditch. But the defendant directors, constituting a majority of the board, refused and directed the zanjeros to deliver the water of the upper ditch exclusively to themselves and other owners of lands above the Bear Valley ditch, whereupon this suit was brought to enjoin the continuance of this discrimination. The claim of the appellants is, that the stockholders of the defendant corporation are equally entitled to share in the water to be distributed as in other dividends of the company. That of the respondents is, that the waters of the upper ditch are

appurtenant to the lands lying above the Bear Valley ditch, and those of the latter ditch to the lands lying below it—the defendant company being, it is claimed, a mere agency of the owners of the lands to distribute to each set of stockholders the water to which they are severally entitled. The facts bearing on these contentions, so far as material, are as follows:—

The tract of land supplied with water by the defendant corporation was originally purchased in the year 1886 by the Chicago Colonization Company, which is described by defendants' witness Malone as "a stock company organized in Chicago." This witness was one of the committee sent out by the company which effected the purchase of the land and of the water-rights in question. These water-rights were purchased from one Brown, and consisted of four hundred and fifty-four "Class A certificates" of the Bear Valley Water Company, each entitling the holder to certain supplies of water. It was indeed understood by the committee, and afterwards explained to the company, that the upper part of the tract could not be irrigated from the Bear Valley ditch; but Brown agreed to effect an exchange of two hundred and thirty-five of the Bear Valley certificates for two hundred and fourteen shares of the stock of the Crafton Water Company, another corporation, whose water could be delivered at the highest point of the land. Brown also agreed to put in the necessary pipes, etc., for the distribution of the water on the land, and to vest the same and the Bear Valley certificates in a corporation to be organized by himself and associates, and on the completion of his contract, turned over to the colonization company.

By the terms of the agreement Brown was to receive for the water-rights purchased thirty dollars per acre, and for the construction of the water system or systems, the same amount; —which, with the purchase price of the land (thirty dollars per acre), made the aggregate cost per acre ninety dollars. Accordingly, this arrangement having been made, the land was subdivided and platted by the committee, and for the purpose of distributing it among the individual colonists the several subdivisions were valued at from sixty dollars to one hundred dollars per acre. This appraisement, according to

the testimony of Malone, was made without regard to the water, it being contemplated that all the land should be equally supplied. As stated in his own language, "Our contract was, we were to receive one inch of water to seven acres of land for the whole. . . . The supply of water was to be the same on all the land; the tract was to receive one inch to seven acres. The only difference was its coming through the two different sources." And he adds: "Our certificates called for one inch to seven acres." Accordingly, upon the report of the committee to the company in Chicago, the lands were distributed by lot to the colonists. But how this was effected —whether by conveyance from the vendor to the company, or some agent of the company, and conveyances from it or its agent to the parties, or by conveyances from the vendor directly to the latter—does not appear. All that appears as to the writings by which the arrangement was carried out is, that the purchasers received "certificates" calling for "one inch [of water] to seven acres."

The defendant corporation was accordingly organized by Brown and his associates, and the four hundred and fifty-four Bear Valley certificates transferred to it; for which, under a resolution of the board of directors of date November 4, 1886, they became entitled, upon the payment of twenty dollars per certificate, to receive an equivalent number of shares of the new company. Accordingly, from the statement signed by Brown, appearing in the minutes of the company, of date February 9, 1887, it appears that the number of shares specified—with other shares the issue of which is not explained— had previously to that date been issued to them, and from the same writing it further appears that the scheme was that these were to be canceled and in lieu of them one share of stock issued to each of the colonists for each acre of land owned by him. This scheme, it may be gathered from the evidence, was carried into effect and the stock issued accordingly, and it is so assumed by the parties and found by the court.

At this time the exchange of Bear Valley certificates for stock of the Crafton Water Company had not been effected, but it seems that Brown and his associates—who continued in the management of the company until some time subsequent

CXLI. Cal.—15

to January 11, 1888—had an arrangement with the Crafton Water Company for securing this stock, and that the exchange was consummated in April, 1890. In the meanwhile, as may be gathered from the resolution of the board of directors referred to in the findings of date September 20, 1892, and other circumstances, the two hundred and thirty-five Bear Valley certificates set apart to be exchanged for the Crafton Water Company stock had been allotted to those of the stockholders owning land above the Bear Valley ditch, and pending the consummation of the exchange under a temporary arrangement between the Crafton Water Company and the Bear Valley Water Company, they were supplied with water by the latter company.

Upon the above facts, it is found by the court, in effect, that it was expressly agreed between the Chicago company and the several colonists that the two hundred and fourteen shares of the Crafton Water Company and the two hundred and nineteen Bear Valley certificates were to be vested in the defendant corporation, the former for the separate use of the colonists owning lands above the Bear Valley ditch; the latter, for the use of those owning lands below it; and that there should be issued to the stockholders of the former class two hundred and fourteen shares of stock, and to those of the latter two hundred and nineteen shares, whereby the former should be entitled exclusively to the Crafton, the latter to the Bear Valley water. But these findings are without evidence to support them, and are in fact contradicted not only by the testimony of Malone above cited—on which they are founded—and by the terms of the water certificates referred to by him as issued to the colonists, but by the written contract between each stockholder and the corporation, as expressed in the resolution of the board of directors duly authorized by the by-laws of the company under which the stock was issued, which as embodying the terms of the contract is here inserted: "Resolved, that the stock of this corporation shall be issued only in the manner and on the basis following, to wit: Upon the receipt by the corporation of one water certificate (regularly issued) on stock of the Bear Valley Land and Water Company, or one share of stock of the Crafton Water Company, together with twenty dollars in lawful money of the United

States, the president and secretary of this company are author-
ized to issue to the person transferring such B. V. L. & W.
Co. water certificate or share of stock in the Crafton Water
Company, and paying said sum of twenty dollars, one share
of stock in this corporation, *the water represented by the same*
to be used upon the land in East Redlands of the person to
whom said share is issued, the water represented by said
share to be delivered at the highest corner of the land whereon
the same is to be used.''

The language of this resolution cannot be otherwise con-
strued than as meaning that each share of the company's stock
represented a proportionate part of all the water of the com-
pany, and entitled the holder thereto; and this construction
is confirmed by the consideration that by the contract of sub-
scription each stockholder became liable for his proportion
of the debts of defendant corporation and of the aggregate
expenses of the water system (Civ. Code, secs. 322, 331), and,
therefore, presumably entitled to a corresponding share of the
profits or dividends of the company.   (Civ. Code, sec. 3521.)

It is hardly necessary, therefore, to consider the construc-
tion placed on the resolution by the respondents' counsel,
which is, that in the expression *"the water represented by
the same"* the last word is to be regarded as referring not to
the share of the stock issued, but to *"the share turned in,"*
or to remark that this is obviously *irreconcilable* with the
grammatical construction of the sentence.   But it may be
observed, as tending strongly to confirm the construction we
have placed on the contract, that the two hundred and four-
teen shares of the Crafton Water Company's stock were not
(as is assumed) turned in by the stockholders whose lands
were to be benefited, but, in pursuance of Brown's contract
with the colonization company, by Brown and his associates,
to whom the corresponding stock was originally issued.   These
shares were canceled and shares in lieu of them issued to
the colonists on the basis of one share to each acre; which was,
in effect, a transfer of the stock.   The new stockholders,
therefore, did not receive their stock in exchange for Crafton
water "turned in" by them, but in exchange for more than
their share of the Crafton stock jointly owned by the com-
pany and turned in by it through Brown.   For it is also to be

observed that the two hundred and fourteen shares of Crafton water stock were acquired by the company at an extra expense of something over six hundred dollars as compared with the cost of the Bear Valley water—being the value of twenty-one Bear Valley certificates required in addition to the two hundred and fourteen corresponding to the number of shares acquired, and there is no reason to suppose that the expense thus incurred by all was for the exclusive benefit of part of the stockholders only. There is therefore nothing to exempt the case from the operation of the ordinary rule, which is, that in the absence of provision to the contrary in the certificates of stock, or in the resolutions, by-laws, or charter authorizing its issue, or other writing, the stockholders are to be regarded as being equal in right (Morawetz on Corporations, secs. 279, 305; 2 Thompson on Corporations, secs. 2224, 2250); which indeed is but an obvious application of familiar principles of contract to the relations of the parties. (Civ. Code, secs. 1625, 1638, 1639; Code Civ. Proc., secs. 1856, 1971.)

Much stress is also laid by the respondents' counsel on matters in pais occurring since the organization of the company. These are: 1. The habitual use of the Bear Valley water on the land lying below the Bear Valley ditch and of the Crafton water on the lands lying above it; 2. A resolution of the board of directors, of date May 1, 1895, denying the petition of one White "to place a hydrant on the corner of his property lying above the Bear Valley canal," and another resolution of the board, of date July 16, 1896, "that no more water from above the Bear Valley canal be delivered on land below said canal"; and 3. The fact that these resolutions were passed, and that the water was used by the stockholders, or some of them, under claim of right. But we do not think these facts, or the facts found by the court,— which go somewhat beyond them,—can be regarded as materially affecting the rights of the stockholders as determined by their contract with the company. For, from the nature of the case, there could not be any continuing occupancy of the water by any of the stockholders, but occupancy only at times when the water was delivered to them. Nor in view of the relations of the parties could such occupancy as they had

be regarded as adverse either to the company or to their fellow-stockholders. Hence no rights could be acquired by prescription. Nor can any just claim of right, by way of estoppel, be predicated on the plaintiffs' acquiescence in the use of the water as it was used. So long as they were supplied with water they had no right to complain, and there is therefore no ground on which they can be held to be precluded from asserting their right to their proportionate share of the water, now that the company has ceased to supply them.

We advise that the judgment and order appealed from be reversed.

Gray, C., and Cooper, C., concurred.

For the reasons given in the foregoing opinion the judgment and order appealed from are reversed.

McFarland, J., Henshaw, J., Lorigan, J.