[L. A. No. 992. Department Two.—December 29, 1902.]

HARRISON FULLER et al., Appellants, v. AZUSA IRRI-
GATING COMPANY et al., Respondents.

WATER RIGHTS—CONVEYANCE TO CORPORATION—REGULATION OF USE—
PRESCRIPTION.—Upon a construction of the various transfers and
agreements mentioned in the opinion, it is held that the plaintiffs
surrendered to the corporation defendant the right of control or
regulation in the use of the water in question both for domestic
and irrigation purposes; that the charge imposed by the defendant
for the use of the water for domestic purposes was a reasonable
regulation; and that the plaintiffs had not acquired by prescription
any right to take water from the ditch of the defendant for such
purposes.

APPEAL from a judgment of the Superior Court of Los
Angeles County and from an order refusing a new trial.
Walter Van Dyke, Judge.

The facts are stated in the opinion.

J. S. Chapman, for Appellants.

Silent & Campbell, for Respondents.

CHIPMAN, C.—The action is to restrain defendants from
interfering with a water-pipe attached by plaintiffs to the
water-ditch of defendant corporation, to supply water for
domestic purposes. The court gave judgment for defendants,
from which and from the order denying their motion for a
new trial plaintiffs appeal. The court made twenty-eight
separate findings of fact, most of which are unchallenged.
It appears from these findings,—1. That prior to 1885 per-
sons known as "old users" had appropriated from the San
Gabriel River, in Los Angeles County, a large quantity of
water for the irrigation of their lands for domestic use
thereon, and diverted said water from said stream and carried
it to their lands by means of an earth ditch. 2. Said old
users composed a community of many persons owning lands.
3. The lands including the lands owned by plaintiff, Mrs.
Fuller. 4. Ten acres of which she purchased in June, 1885,

and five acres she purchased in 1886. 5. No part of the ditch touched Mrs. Fuller's lands. 6. In October, 1885, plaintiffs ran a water-pipe, varying in size from two inches down to one inch, from said ten-acre tract along the public road, a distance of one quarter of a mile, and connected said pipe with said ditch for the purpose of supplying themselves with water for domestic use, and "thereafter continued to use said pipe for that purpose until the location of said pipe was changed, as stated in the 13th finding." 7. About August, 1886, a part of the old users, "embracing about a third or half thereof," organized the Azusa Irrigating Company, the defendant corporation, under the laws of the State. 8. "The purpose for which said corporation was formed, as expressed in the articles of incorporation, was as follows: 'To purchase or otherwise acquire water and water rights, construct dams, ditches, reservoirs, lay pipes and any and all kinds of aqueducts and water-works, to divert, control, manage, and distribute waters to its respective stockholders, according to their respective rights, and to sell and dispose of any surplus that may remain, but to its stockholders only, to lease its works and water rights to others, to control, manage, and distribute the same to the said stockholders, and the company or its lessees to have the right to charge reasonable compensation for the waters distributed to its stockholders.' " The court also found that the corporation was formed "for the further object of more conveniently managing, controlling, and distributing the waters of its stockholders, which had been appropriated as aforesaid, and for regulating the use and distribution thereof." 9. About September 28, 1886, the old users who had formed said corporation, including plaintiffs, conveyed to it, by deed, all their rights in said ditch and in the waters diverted thereby and so appropriated by them, and about said time plaintiffs became stockholders in said corporation, and received shares therein in conformity to said deed, and plaintiff Mrs. Fuller has ever since been, and now is, a stockholder in said corporation. The deed is set forth and shows that the corporation "was mainly to provide the means for improving the methods of diverting, managing, and distributing said waters among the parties entitled," and that they conveyed all their "right, title, and interest in the waters of the San Gabriel River and also in the dams, ditches,

and other water-works by and through which we have been accustomed to obtain water for irrigation and domestic uses, and with the understanding that the said Azusa Irrigating Company, its assigns and successors, shall at all times manage, control, and distribute said waters so conveyed, for our benefit, according to our respective rights as fixed by our agreement, and in accordance with the stock issued or to be issued to us, so long as we hold the same. 10. After the corporation was formed it used said ditch jointly with the remaining old users, who had not joined the corporation until the year 1893, when a new cement ditch was constructed. 11. Plaintiff Harrison Fuller was director and president of the corporation from October 8, 1888, to October 8, 1890. 12. To insure an equitable distribution of the water diverted by the ditch and to raise funds to defray necessary expenses, the old users and owners imposed charges for use of the water, which were generally acquiesced in, and by which water was used at stated periods in rotation, and, as a general rule, "water necessary for domestic use was taken from the run of water for irrigation, . . . and was stored in cisterns or other receptacles provided therefor, but this custom was not enforced except in seasons of scarcity of water, but when there was an abundance water for domestic use was supplied by the *zanjero* whenever any one entitled to water requested or demanded it." There was but one instance prior to February 25, 1893, where permission was given to a stockholder to attach a pipe to the new ditch for domestic use, and that permission was in consideration of special rights of way granted the company, and the company reserved the right to cut off the water in case of scarcity and by general regulation to impose a charge for its use and to regulate the use. This finding contains certain by-laws adopted by the corporation and signed by plaintiffs. Among the provisions are the following: Shares were to be issued, one and one half shares for each acre of land owned up to twenty acres; until the system of pipes and ditches contemplated by the company shall have been completed, water shall be distributed to the subscribers in the same order, as regards rotation and amount, as at present. Article XXI provided that water for irrigation shall be distributed from the main pipe of the company; no person shall have the right "to open a gate or take water

from any point on the pipes of the company except through
the direct action of the *zanjero* appointed by the board of di-
rectors." Penalties were imposed for violation of regulations,
and the regulations authorized the shutting-off of water from
use of the offender until he had paid his fine. On January
12, 1892, the stockholders adopted a by-law that water belong-
ing to the stockholders shall be delivered to them "at such
terms, times, and under such regulations as the board of
directors may prescribe, and as shall be most equitable and
just to all the stockholders." In a code of by-laws adopted
by the corporation January 28, 1893, it was provided that the
corporation having been formed for mutual purposes, its
affairs shall be conducted on that principle; the directors are
given power to fix special rates for parties who own water,
but who are not stockholders, and who are called "alien
water-owners. Article VII of the by-laws is as follows:
"The board of directors, on or before the fifteenth day of
February of each year, shall make rules and regulations for
the distribution of the water in rotation on an equitable and
just basis as nearly as practicable in agreement with the
water rights of the several stockholders. They shall deter-
mine and fix the water rates to be charged to stockholders,
and alien water-owners from time to time for water service;
said rate to stockholders shall not exceed an amount sufficient
to cover the current expenses, including expenses of running
the water and keeping the ditches and pipe-lines in order."
13. In 1888 (precise date not fixed by the evidence)
plaintiffs removed their pipe, which was laid along the road
from said ten-acre tract to said ditch for domestic water, and
detached the pipe from said ditch and moved the same about
eight hundred feet farther down and attached the pipe at
this new place, and thereafter continued to use said pipe to
supply domestic water until said ditch was abandoned. 14.
The corporation commenced the construction of the new or
cement ditch prior to February, 1893, and completed it about
this date. "This ditch was intended by the corporation, as far
as its rights in the old ditch were concerned, to replace the
earthen ditch. A new right of way was procured, and near
the lands of Mary A. Fuller, the new ditch was located about
three hundred feet farther east thereof, and no part of the
new ditch is on her land. When the new ditch was completed,

the water which was formerly carried in the old ditch was turned into and carried in the new ditch, and the old ditch was, with the consent of plaintiffs, abandoned. The plaintiffs, as far as they had any interest in the matter, joined in the execution and delivery to the defendant corporation of a deed for the right of way for said new ditch, which deed is worded as follows:'' Then follows the deed, which bears date June 6, 1893, and was drawn with the view of having all old users sign, and it was executed by plaintiffs and by many others and at different times, and was finally recorded in 1895. (This deed was a grant of right of way for the new ditch, and recited the intention of the company to abandon to the owners the lands occupied by the old ditch where not used in the new; recited that the grantors are greatly benefited by the construction of the new system of ditches and pipe-lines, ''which benefits they severally acknowledge to be valuable.'' The new line did not touch plaintiffs' land, and their signatures were no doubt for the purpose of obtaining their consent to abandon the old line, and they, including plaintiffs, did in fact reoccupy the land used in the old ditch and plowed it up, as testified by plaintiff Harrison Fuller, though the court found otherwise,—finding 5.) 15. The company provided in the new ditch irrigating gates, and also attachments for pipes for water for domestic use, but made no such connection for domestic use for plaintiffs' premises, because the superintendent did not know where plaintiffs wished it made. 16. February 25, 1893, plaintiff Harrison Fuller applied for permission for himself, Casey, and Robinson to connect a pipe with the new ditch for water for domestic use, and the board at that meeting passed a resolution permitting the various stockholders to attach pipes for domestic purposes, singly and in groups, ''under such regulations and of such size as the board may from time to time prescribe.'' The board reserved the right ''to fix a rate for the use of domestic water, and the right to such shall depend upon the payment of the rates so fixed,'' and reserved the right to shut off the water for domestic purposes entirely, ''in case of scarcity, and to cut off the pipes and to shut off the water for the violation of the rules or for the non-payment of water rates.'' After this resolution was adopted, and pursuant to its permission, plaintiff and Casey, jointly and for the use of Robinson, ''extended

the pipe which plaintiffs had laid from their premises to the said old ditch to said new ditch, and after said twenty-fifth day of February, 1893, connected the same with said new ditch, and have ever since, except when interrupted by the defendant corporation, as hereinafter found, drawn water for said new ditch by means of said pipe for domestic use of said plaintiffs, Casey and Robinson, and for one Mosher, who has succeeded to the rights of said Robinson, and said Harrison Fuller has charged said Robinson and said Mosher fifty cents per month for the use of said pipe for domestic purposes."

17. The year 1896 was a very dry season and one of great scarcity of water. At that time but few pipes had been attached to the new ditch for water for domestic use, and from these a constant supply could be drawn whenever needed. The remaining users of water stored a part of their irrigating water, when entitled thereto, in cisterns or other receptacles for domestic use. During that year the board for the first time imposed a charge for domestic use of water, when it was not taken from the irrigating head of water, and on June 1, 1896, the board adopted regulations governing the subject; a charge of one dollar per month, payable in advance "from April 1, 1896," was fixed for domestic service where pipe connection with the ditch had been made, and should any user fail to pay for sixty days, the superintendent was directed to cut off the connection and not to allow it reopened, except by order of the board, "and no domestic water shall be used for irrigating purposes." Regulations were at the same time made for irrigating water, and it was provided that "no member of the board or stockholder or other irrigator has any right to give the *zanjero* any orders as to his duties." In November of that year water again became more plentiful, and the board ceased to make any charge for domestic water, and have made no charge since that time. "Under said regulation said plaintiffs were charged one dollar per month for said domestic water, commencing April 1st and ending with the month of October, making in all the sum of seven dollars, and payment thereof was demanded from time to time of plaintiffs, as said water rate accrued, and said plaintiffs refused to pay the same or any part thereof, and have continued to so refuse, basing their refusal upon the ground that they

had a right to said domestic water and a right to attach said pipe to said new ditch, independent of said regulation, and were not obliged to pay said charge.'' 18. After plaintiffs had attached their pipe for domestic use to the new ditch they claimed the right to do so and to draw water for such use, adverse to said corporation and independent of its permission or regulation. 19. The corporation demanded of plaintiffs that Mrs. Fuller ''execute a disclaimer, acknowledging that their right to connect said pipes with said new ditch for domestic use, and the right to maintain the same is held by them under license from defendant corporation, and said plaintiffs refused to make said disclaimer or acknowledgment.'' 20. On December 29, 1896, by direction of the corporation, its superintendent cut off said pipe of plaintiffs. 21. Said pipe was ordered cut off because plaintiffs refused to pay water rate for domestic use, and because they refused to make said disclaimer, and claimed said right adverse to defendant corporation. 22. Plaintiffs have never offered to pay said charge for domestic water. 23. Plaintiff Harrison Fuller has in all said matters acted as agent of plaintiff Mrs. Fuller, and with her approval. 24. In cutting off plaintiffs' pipe said corporation did not act maliciously or wantonly. 25. Plaintiffs have not been damaged in any sum by defendants. 26. When plaintiffs' pipe was cut off from said new ditch there was and since has been sufficient water in said new ditch to supply plaintiffs with domestic water without depriving any other person entitled thereto. 27. On December 31, 1891, the stockholders (among them Mrs. Fuller) passed a resolution, reciting the provisions of the deed of September 28, 1886, known as the ''trust deed,'' and also reciting a certain compromise agreement of January 26, 1889, relating to water rights, and resolved that all the waters so conveyed ''be reconveyed to the owners of the land and the stock of the corporation entitled thereto, to be ascertained and determined by the board of directors,'' and that the water acquired by said compromise agreement be conveyed to the stockholders, subject to said compromise agreement. Under this resolution reconveyances were made, but not to plaintiffs. 28. Said resolution of June 1, 1896, and other regulations and by-laws regulating ''the distribution and use of water, and said charge is a reasonable and proper charge

for said water, and said water-rate was paid by all persons having connection with said new ditch for domestic use, except plaintiffs.''

The following stipulation was entered into at the trial: ''It was agreed by the attorneys for plaintiffs and for the defendants that defendants' answer states substantially the character and nature of plaintiffs' water right, and the plaintiffs accepted as true the substance of the allegations of the answer that for more than thirty years a large number of people had used what is known as the 'old ditch' jointly, and had diverted the water from the San Gabriel River, which was apportioned among them according to their respective rights, as recognized among themselves, and said ditch and water continued to be so used, up to the time that the defendant the Azusa Irrigating Company was incorporated, when a large number of the old users made a deed to said corporation, conveying to it their water rights for the purposes of management and control. The deed referred to was read in evidence, and is set forth in full in the ninth finding herein, and is dated September 28, 1886, and was signed by the plaintiffs in this action, and by a large number of others of the said old users.''

Counsel differ radically as to the intention and reach of this agreement. Like most blanket stipulations, while shortening transcripts they lengthen briefs proportionately, and often leave the court in doubt as to their limitations. We think there is enough evidence in the case without resort to the answer beyond the plain admissions of the stipulation. As conclusion of law, the court found that plaintiffs are not entitled to the relief prayed for.

Plaintiffs claim the right to connect their pipe with the new ditch, and to maintain it there, and to have domestic water therefrom, free from any control of the defendant corporation. This right is claimed by virtue of the interest acquired by plaintiffs in the old ditch and the water conveyed by it, and also by prescription.

It is also claimed that the defendant corporation had no power either of distribution of water or levying assessments or establishing charges to be collected from plaintiffs; and if the corporation had power to make any regulation establishing rates and to shut off the water for refusal to pay them,

the regulation was void because unreasonable. The necessity for stating at length the findings precludes a discussion of the alleged insufficiency of the evidence to support them. We have examined the evidence relating to such material findings as are challenged, and are satisfied that there is sufficient to justify them.

Whatever may have been the relative rights of the old users of water prior to the formation of defendant corporation does not clearly appear; they had a community of interest of some sort in all the water diverted by the old ditch, but the extent of each user's right does not appear further than that it bore some relation to his acreage of land. But these mutual rights to the use of water were subject to rules and regulations and to assessments to cover expenses which by common consent seem to have been enforced through a *zanjero,* or superintendent. In most instances domestic water was obtained from the run of water allowed for irrigation, and was stored in cisterns or other receptacles to be used intermediate the irrigating periods of the user. When Mrs. Fuller, in 1885, purchased lands in the district, her water rights were presumably the same as had theretofore attached to the lands generally. To obtain domestic water more conveniently than by cisterns, plaintiffs, in October, 1885, ran a pipe from their premises along the public road about a quarter of a mile and connected with the old ditch, and they used this pipe until in 1888, when they removed it from the public road and reattached it to the ditch about eight hundred feet farther down the ditch, and thereafter continued to use the pipe until in February, 1893, when the old ditch was abandoned and the new ditch was completed. For the better and more orderly control and regulation of the water, many of the old users, including plaintiffs, formed a corporation in 1886, for the purposes stated in the findings, and Harrison Fuller was a director for two years from and after October, 1888, and Mrs. Fuller was a stockholder therein from the date of its formation, and plaintiffs had conveyed to the corporation, as had other land-owners, all their rights in the water and ditch, according to their respective rights. During all these years water was abundant. There was no objection made to this use, and there was no claim by plaintiffs that they were using the pipe in hostility to other users or the corporation. I do not think the circum-

stances or facts show that plaintiffs have acquired prescriptive rights to take water for domestic use through this pipe which are beyond the control of the corporation. It is not claimed by defendants that plaintiffs had no right to water for domestic purposes during this period, or that they have not such right now; the claim is, that they had not the right, and have not now the right, to use the pipe free from any control by the corporation. The evidence shows that prior to the abandonment of the old ditch the corporation made and enforced regulations for the use of water by stockholders, with the concurrence of plaintiffs, which were inconsistent with the claim that plaintiffs were using a right different and greater than others were entitled to, and in hostility to their rights. When the new ditch was completed it occupied other ground, and did not pass over plaintiffs' land. Plaintiffs and others signed a deed bearing date June 6, 1893, by which the old ditch was abandoned and new rights of way granted. So far as the corporation was concerned, and it represented all stockholders, the new ditch was intended to replace the old ditch, and on its completion the water was conveyed through the new ditch, and with plaintiffs' consent the old ditch was abandoned. The corporation provided by resolution, in February, 1893, that stockholders might attach pipes to the new ditch for domestic purposes, under such regulations and of such size as the board of directors of the corporation might from time to time prescribe, reserving the right to fix a rate for the use of domestic water, etc., as shown in the findings. We do not see any thing unreasonable in these regulations. The provision that made the rate retroactive may be conceded to be unwarranted and not enforceable. But for the subsequent months during which the rates were enforced the regulation would not be open to this objection, and for these months plaintiffs were liable. They did not put their refusal to pay on the ground that the regulation was in part retroactive; they claimed, and still claim, only that they had a right to use the water by means of a pipe, free from any charge and any control whatever by the corporation.

It seems to us that in forming the corporation and conveying their rights to it for the purposes declared by the articles, all the stockholders, Mrs. Fuller with the rest, surrendered the right of control or regulation in the use of water both for

domestic and irrigation purposes. There could not well be independent rights in individual stockholders, free from all regulation, unless specially reserved in the deeds, for that would destroy the power of the corporation to make the enjoyment of the water sufficient for all. This right of regulation, in the absence of any restricting clause in the deeds, would attach as an incident to the title. The evidence shows no such original right as is claimed by the original appropriation, for from the beginning the use was subject to regulations and to assessments to defray expenses, and these rules were recognized by all old users.

In the deed of 1886, it was recited, among other things, that the company "shall at all times manage, control, and distribute said waters so herein conveyed for our benefit and according to our respective rights as fixed by our agreement, and in accordance with the stock issued or to be issued to us. . . . Stock to be issued according to our respective rights in said waters as fixed by our said agreement, the said corporation or its successors having the right to charge a reasonable compensation therefor, and to levy assessments on stock to construct new water-works and to make repairs and all needed improvements in the water system and methods of distribution." What the words "the respective rights as fixed by our agreement" mean is not clear. The agreement referred to I do not find in the record. The water was to be managed, controlled, and distributed according to these respective rights. There is nothing in the evidence to warrant the conclusion that the terms, "respective rights" gave to any one stockholder a right not given to all, or that the terms included a right, independent of all regulation by the corporation, to use water in the particular manner and for the particular purpose he might at the time happen to be using it. The terms most likely referred to the general right to water as measured by the acreage owned by each stockholder. The same language, substantially, is used in the articles of incorporation. (See findings marked 8 and 9, *supra*.) It is not at all likely that stockholders who had no pipe connections would have consented to a use by those who had such connections that these privileges were to be recognized as wholly beyond the control and regulation of the corporation, for such a concession would have destroyed the mutuality manifest in the articles and in

the deed, and both the deed and articles recognize the right to charge for water. The court found that plaintiff Harrison Fuller, on February 25, 1893, for himself and two others, applied to the corporation for permission to connect a pipe with the new ditch for their domestic use, and at that time the resolution was passed noted in finding 16, *supra,* and that plaintiffs made the pipe connection pursuant to this resolution. Plaintiffs accepted the license on the conditions stated in the resolution, and for more than three years there was no charge imposed for the use. When water became scarce, and the conditions were enforced temporarily, plaintiffs resisted, refused to pay any charge for water, and claimed an absolute right beyond defendants' control. Thereupon defendants cut off the water. There was no other course to pursue in fairness to other stockholders. When the new ditch was completed and plaintiffs consented to the abandonment of the old ditch and attached their pipe to the new ditch under license of the corporation, they not only waived any right they formerly had but consented to the regulations imposed in taking water from the new ditch. By setting up an adverse claim and refusing to be governed by the regulations of the corporation, it became necessary for the corporation to assert its rights to prevent plaintiffs from acquiring prescriptive rights. It was but just to other stockholders and to old users not stockholders, who had rights in the water, to protect the supply against unfair invasion by individual users. It appears that plaintiffs have been, by agreement, permitted to continue to take domestic water through this pipe, pending the litigation. It also appears that during the time defendant was endeavoring to collect one dollar a month, the rate fixed for the use by pipe, plaintiffs were collecting fifty cents per month from a user who obtained water through plaintiffs' pipe. It also appears that plaintiffs were to some small extent at least using water from the pipe for irrigation, which was in violation of regulations. I do not understand that the corporation denies the right of plaintiff to obtain water for domestic use subject to reasonable regulations by means of this pipe connection; nor do I understand that the court decided that plaintiffs had no such right. The corporation seems to have provided outlets in the cement ditch for pipe connections, and did not provide one for plaintiffs, because at the time it

did not know where plaintiffs wished it located. Plaintiffs afterward made their own connection with permission of the company, and should be permitted to use their pipe for conveying domestic water, subject to such reasonable regulations as necessity requires should be imposed.

It is advised that the judgment and order be affirmed.

Haynes, C., and Cooper, C., concurred.

For the reasons given in the foregoing opinion the judgment and order are affirmed.

McFarland, J., Garoutte, J., Harrison, J.