[L. A. No. 3015. In Bank.—November 8, 1912.]

C. E. THAYER and W. A. THAYER, Respondents, v. CALI-
FORNIA DEVELOPMENT COMPANY (a Corpora-
tion), and W. H. HOLABIRD, Its Receiver, Defendants
and Appellants; IMPERIAL WATER COMPANY NO.
1, Intervener and Appellant.

WATER—APPROPRIATION FOR BENEFICIAL USE—RIGHT ACQUIRED IS
PRIVATE—STREAMS UPON PUBLIC DOMAIN.—Under the law of this
state as established at the beginning, and as embodied in the Civil
Code of 1872, the water-right which a person gains by diversion
from a stream for a beneficial use is a private right, which is subject
to ownership and disposition by him as in the case of other private
property. The same is true as to the water-rights in streams upon
the public domain in California which the act of Congress of July 1,
1866, confirmed or provided for the acquisition of in the future.

ID.—WATER DEDICATED TO PUBLIC USE—ACQUISITION AND DEDICATION
DISTINCT ACTS.—Even when property is dedicated or appropriated
to public use for gain by persons or private corporations, the title
and ownership is private and the only interest of the public is that
of beneficiaries of the use or trust. The property does not become
impressed with a public use or trust until after the owner has first
acquired it and then dedicated it to the use. The acts of acquisition
and of dedication respectively are distinct from each other, and,
technically the latter must follow the former and cannot precede
or accompany it.

ID.—APPROPRIATION NOT A DEDICATION TO PUBLIC USE.—An "appropria-
tion of water" under the Civil Code is not, *ipso facto,* a dedication
or appropriation to public use. The additional act of dedication is
as necessary to the creation of a public use in a water-right so
acquired as it would be if the right was acquired by conveyance or
in any other manner, or as in the case of any other property
dedicated to public use.

ID.—ESSENTIAL FEATURES OF PUBLIC USE—USE OPEN TO INDEFINITE
PUBLIC.—The essential feature of a public use is that it is not
confined to privileged individuals, but is open to the indefinite pub-
lic. It is this indefiniteness or unrestricted quality that gives it its
public character.

ID.—USE OF WATER IN MUNICIPALITIES—WATER FOR IRRIGATION WHEN
NOT A PUBLIC USE—USE LIMITED TO PARTICULAR CLASS.—In the
case of a public use of water in villages, towns, and cities, the right
to the use usually extends to every inhabitant within the range of the
distributing system or who can get access thereto. In the case of

water for irrigation, the class is necessarily more select, and does not include the general public within the area served. This is so because only those occupying land can make use of the water. For this reason, while there may be a public use for the benefit of landowners, the use of water for irrigation is not public unless the water is available, as of right, upon equal terms, to all landowners of the class and within the area to be benefited who can get water from the ditches to their lands. If the dispenser of water has the right to say who shall have it, and upon what terms, selling to one and refusing to sell to another at will, it is not devoted to public use.

ID.—USE OF WATER LIMITED TO LANDOWNERS WHO ARE STOCKHOLDERS IN CORPORATION RECEIVING IT.—A water company, whose method for the disposition of the water appropriated by it for the use of itself and others for the purpose of developing power and for the irrigation of land in a specified territory, and whose conduct in distributing the same, have been wholly inconsistent with the idea that the water was held out for general sale or distribution, and were consistent only with the theory that the intention was to retain control of the water to the extent, at least, of choosing for itself the persons and corporations to whom it should be sold or delivered, and the terms and conditions on which such sales or deliveries should be made, and whose uniform practice had been to furnish water to certain subsidiary corporations organized by it for the irrigation of such lands situated within specified districts as should belong to their stockholders, and to no other persons, on certain prescribed conditions for the apportionment of the water between such stockholders, and for the payment therefor, did not devote its water to public use.

ID.—CHARACTER OF RECIPIENT CORPORATIONS.—The effect of such a sale and distribution is the same whether the corporations to whom the water was furnished were merely subsidiary to and agents of the distributing company or were or should become independent companies, and merely purchasers of the water so sold and distributed.

ID.—PUBLIC USE CARRIED ON IN FOREIGN COUNTRY—SERVICE IN CALIFORNIA NOT AFFECTED.—The fact that such distributing company was carrying on a public use in a foreign country, and had received from that country a grant of the power of eminent domain, would not affect the character of the service of the corporations doing business in California to whom it distributed water, and the fact that it derived all of its water from the same source is immaterial. A part of a stream, or a part of a single appropriation, may be devoted to public use and another part entirely to private use.

ID.—CONSTRUCTION OF CONSTITUTIONAL PROVISION AS TO PUBLIC USE OF WATER.—Section 1 of article XIV of the constitution, providing that "the use of all water now appropriated, or that may hereafter be appropriated, for sale, rental, or distribution, is hereby declared to

be a public use, and subject to the regulation and control of the state, in the manner to be prescribed by law," does not create a public use whenever any water is sold or distributed, regardless of the number of persons to whom it is delivered, the manner or character of the disposition made of it, or of the transfer of the right thereto.

ID.—MEANING OF TERM "APPROPRIATED" WATER.—The word "appropriated," as used in that section, does not refer to the act by which the water is acquired, as for example, the taking from the stream, but to the act or acts by which it is designated, set apart, and devoted to the purposes of sale, rental, or distribution. Such section must be understood to apply, as it has previously always been construed to apply, to cases where one has appropriated water generally, for sale, rental, or distribution, and not to cases where sales are made to particular persons at a fixed price by ordinary contracts of purchase and sale.

ID.—RIGHTS TO WASTE WATER NOT USED BY APPROPRIATOR.—The fact that such distributing company conducts more water through its canals than is used, and that there is always some waste water discharged from its distributing system, did not impose upon it the obligation of furnishing such excess to a person who did not belong to the class to whom its disposition of water was limited. So much of the water as may be unavoidably wasted is to be deemed a part of that which is appropriated to the beneficial use and which the company has the right to take. So far as any other waste water is concerned, it is water to which the company has acquired no right by its appropriation, because not applied to a beneficial use, and is subject to appropriation by others.

APPEALS from a judgment of the Superior Court of Imperial County.   George H. Hutton, Judge presiding.

The facts are stated in the opinion of the court.

J. W. McKinley, W. B. Mathews, and S. B. Robinson, for W. H. Holabird, Receiver, Appellant.

Hunsaker & Britt, and W. N. Goodwin, for Intervener and Appellant.

Conkling & Brown, for Respondent.

Lewis F. Byington, Ernest Weyand, Haines & Haines, W. H. Sprague, John M. Eshleman, Max Thelen, and Douglas Brookman, *Amici Curiae*, also for Respondent.

THE COURT.—This is a proceeding in *mandamus*, instituted in the superior court of Imperial County on December 20, 1910, to compel the California Development Company a corporation, through its receiver, to deliver to plaintiff C. E. Thayer, the wife of her coplaintiff, W. A. Thayer, out of its central main in Imperial Valley, water to irrigate her lands, upon the theory that the water therein is appropriated and held by it for sale, rental, and distribution generally to the members of that farming neighborhood. Defendants and intervener joined issue on that question. The trial court found with plaintiffs and entered judgment accordingly. These are appeals from such judgment by defendant Holabird, the receiver, and by the intervener.

The California Development Company was organized under the laws of the state of New Jersey, for the purpose, among others, of acquiring, holding, constructing, and maintaining headings, dams, ditches, etc., for collecting, storing, and conducting water and irrigating land; supplying and distributing water to and irrigating and cultivating the land of itself and of others; and of selling or letting such water or the right to use the same. On December 15, 1895, it caused to be posted at a point on the Colorado River in this state, distant one thousand six hundred feet north of the point where the international boundary line between the United States and Mexico crosses said river a notice of appropriation claiming for itself and others ten thousand cubic feet flow per second of the waters of said river at that point. The notice further stated that it claimed the right to said water for the purpose of "developing power and for the irrigation of land in San Diego County, state of California, and in Lower California, Republic of Mexico." It was also stated in said notice that "we purpose carrying the water from the above described point of diversion through a canal which will run in a southwesterly direction through Lower California, Republic of Mexico, and thence into that portion of San Diego County, state of California, lying to the east of the San Jacinto Mountains and known as the 'New River Country.' Said canal will be 200 feet in width and will carry a depth of 10 feet of water. Its length will be 50 miles, more or less." The detour into Mexico was rendered necessary by topographical conditions. The portion of San Diego County referred to was what is

now known as the Imperial Valley, and all of the same is now contained in the subsequently created county known as Imperial County. In furtherance of its general plan, the California Development Company caused a corporation to be formed under Mexican laws, as its agent and instrument in Mexico, known as "La Sociedad de Yrrigacion y Terrenos de law Baja California (Sociedad Anonima)," the capital stock of which has always been owned and controlled by it, and which practically is the California Development Company under another name. Through this agency it holds all its Mexican property, including some one hundred thousand acres of land, and enters into contracts, including contracts for the furnishing of water in Mexico. The existence of this separate corporation is really an immaterial matter so far as the questions involved in this case are concerned. Whatever was done through it will be regarded as in fact done by the California Development Company.

Before January 11, 1902, said Development Company had constructed from said point on the Colorado River at which its notice of appropriation was posted, known as Hanlon's heading, southwesterly through Mexico a distance of twenty miles, and thence northwesterly to a point on the international boundary line, a canal with the capacity sufficient to carry and deliver at said point not less than one thousand five hundred cubic feet of water per second.

Said company has never owned any of the land in Imperial Valley to which it proposed to furnish water for irrigation. Those lands are naturally arid and desert in character and without irrigation are worthless and uninhabitable, but are of great and exceptional fertility when irrigated. They are irrigable from the Colorado River and from no other source. At the date of the organization of the Development Company, such valley was unoccupied and a desert, and substantially the whole thereof was surveyed public land of either the United States or the state of California.

The plan adopted by the Development Company for its disposition of the water for irrigating such lands was substantially as follows: The company mapped out districts of territory in Imperial Valley as units of irrigation, each of which was to be occupied by a mutual water company formed under the laws of this state. These companies were to be

organized by the Development Company, each of said companies to have a capital stock divided into as many shares as there were approximately acres of land in the district described in its articles of incorporation, which the Development Company believed could be reasonably irrigated. The purpose of each said company was to be to procure water for the irrigation of said tract and distribute the same upon land owned by its stockholder only within said general tract, at the rate of not to exceed four acre feet per annum per acre for each share of stock owned by each stockholder, and for its stockholders only. Each share of stock was to be located upon lands at the rate of one share per acre for each acre of land owned by stockholders where the same could be served by the ditches of the company. The Development Company was to furnish to each of said mutual companies the requisite water for its purpose at a fixed charge per acre foot.

The Development Company caused seven of such mutual companies to be organized, known as Imperial Water Companies Nos. 1, 4, 5, 6, 7, 8 and 12, with an estimated aggregate of irrigable land of four hundred thousand acres. Imperial Water Company No. 1 was organized by five agents of the Development Company on March 23, 1900. The district allotted to it was estimated to contain one hundred thousand acres of irrigable land, and the capital stock therefor was made one hundred thousand shares, with a par value of ten dollars per share. Among its purposes declared in its articles was one to secure a supply of water for irrigation, domestic, and other purposes and to distribute the same at cost among its stockholders only for use on the lands situated in its district, which were described therein. The by-laws were in accord with the plan already referred to, and required each share of stock to be located on land in the district, and restricted the use of water to land on which stock had been located. The stock was transferable and its place of location could be changed by the owner to any land within the district of a mutual company issuing it.

Under a contract between said Imperial Water Company No. 1 and the Development Company, all of the stock of the former, except two thousand five hundred shares, was sold by the Development Company for its own benefit, at an average of fifteen dollars per share, in consideration of which the

Development Company constructed a main canal through the territory of the mutual water company, of sufficient capacity to convey the requisite amount of water to irrigate the lands of the stockholders, being an amount in the aggregate not less than sufficient to furnish annually four acre feet of water for each oustanding share of stock of the mutual water company, and also constructed the necessary lateral or distributing ditches which are owned by the mutual water companies. The Development Company agreed to perpetually furnish said water through such canal and the lateral ditches for fifty cents for each acre foot delivered. Substantially similar contracts were made with each of the other water companies.

All of the stock of Imperial Water Company No. 1, including the two thousand five hundred shares retained by it, has been sold to individuals who have located the same upon land in the district of said company, and are cultivating the same, and the Development Company has been delivering water to such mutual company in accordance with its undertaking. The same is true as to the other mutual companies. Neither the Development Company nor its receiver has ever delivered or furnished any water for irrigation or other purposes to any land in Imperial Valley, or to any consumer of water other than under and in accordance with such agreements, except that water has been furnished under contract to the city of Imperial, a municipal corporation, and to the Holton Power Company, and all water delivered to such companies has been delivered under and in pursuance of the terms of said agreement.

Since the year 1904, said mutual corporations have not been controlled or dominated by the Development Company.

There are between fifteen thousand and thirty thousand acres of land within the district of Imperial Water Company No. 1 in excess of the number of shares of the capital stock provided in its articles of incorporation. Plaintiff C. E. Thayer owns forty acres of such land which is in condition for cultivation and irrigation, and which she desires to irrigate and plant, but upon which no water stock has been located. This land is under the flow of the canal of the Development Company, and constitutes a part of the lands for irrigation of which the said waters were appropriated. By reason of the fact that all of the stock of said Imperial Water

Company No. 1 has been disposed of to others who have located it upon other land, she is unable to procure stock to locate thereon, and Imperial Water Company No. 1 has no water except such as it has procured for its stockholders. On October 18, 1910, she demanded of the defendant receiver that he deliver to her water for the irrigation of such land— namely, one hundred miner's inches for twenty-four hours, tendering him twenty dollars therefor, which, as we understand, is at the rate of fifty cents for each acre foot, which it is claimed was the rate fixed and charged by said Development Company to the other consumers of water. The board of supervisors of Imperial County has never fixed the rates at which the Development Company shall sell, etc., water in such county. The receiver refused to comply with the demand of Mrs. Thayer.

On December 13, 1909, an action was commenced in the superior court of Imperial County by the Title Insurance & Trust Company, a corporation, against the Development Company and others to foreclose the mortgage held by the plaintiff therein upon the irrigation system of the Development Company, and on the same day defendant Holabird was appointed by said court receiver of said system, and has ever since been in control and management of said system.

There was, we think, enough in the evidence to sustain the conclusion of the trial court substantially to the effect that the Development Company had sufficient water to comply with the demand of Mrs. Thayer, without impairing its ability to furnish to those with whom it was under contract the water required by them.

The evidence shows that the Development Company, through its Mexican agency, furnishes water for irrigation to individual consumers in Mexico, at the rate of fifty cents for each acre foot.

The agreements between the Imperial Water Company No. 1 and the Development Company provided that all water delivered to the former is delivered at the Mexican boundary line, and the Development Company has no interest in. said water so delivered after it is delivered at said place. Said Development Company is the owner of the main canal in such district through which such water is carried.

The claim of the plaintiff is, and of necessity must be, that the California Development Company is, either directly, or indirectly through auxiliary companies, engaged in supplying water for public use, that the water controlled by it is dedicated to such use, that the land of plaintiff, C. E. Thayer, is a part of the lands to which such water is dedicated and, therefore, that she is entitled to a portion of the water for the irrigation thereof, on payment of the lawfully established rate therefor.    (See *Fellows* v. *Los Angeles*, 151 Cal. 58, [90 Pac. 137].)    The controlling question in the case, therefore, is whether or not the water here involved is devoted to public use.

Under the law of this state as established at the beginning, the water-right which a person gains by diversion from a stream for a beneficial use is a private right, a right subject to ownership and disposition by him, as in the case of other private property.    All the decisions recognize it as such. Many of them refer to it in terms which can have no other meaning than that the right is private property.    We need not cite them all.    The following early cases sufficiently establish the proposition: *Eddy* v. *Simpson,* 3 Cal. 251, [58 Am. Dec. 408] ; *Irwin* v. *Phillips,* 5 Cal. 146, [63 Am. Dec. 113] ; *Tartar* v. *Spring Creek Co.,* 5 Cal. 398; *Conger* v. *Weaver,* 6 Cal. 557, [65 Am. Dec. 528] ; *Hoffman* v. *Stone,* 7 Cal. 49; *Maeris* v. *Bicknell,* 7 Cal. 262, [68 Am. Dec. 257] ; *Hill* v. *King,* 8 Cal. 336; *Kimball* v. *Gearhart,* 12 Cal. 47; *Ortman* v. *Dixon,* 13 Cal. 38; *Kidd* v. *Laird,* 15 Cal. 180, [76 Am. Dec. 472] ; *Rupley* v. *Welch,* 23 Cal. 455.

By the act of Congress of July 1, 1866, [14 Stats. 251], the United States confirmed all water-rights then vested, in streams upon the public domain in California, and provided for the acquisition of similar rights therein in the future. These, of course, became private property when so acquired. (*DeNecochea* v. *Curtis,* 80 Cal. 397, [20 Pac. 563, 22 Pac. 198] ; *Natoma Water etc. Co.* v. *Hancock,* 101 Cal. 42, [31 Pac. 112, 35 Pac. 334].)

The Civil Code of 1872 recognizes and declares the same doctrine and prescribes the mode by which water-rights may be gained and protected.    Section 1410 declares that ''the right to the use of running water'' of a stream, cañon or ravine ''may be acquired by appropriation.''    The succeed-

ing sections to 1422 inclusive, prescribe the mode by which it may be acquired. The language plainly imports that the right when acquired, is the property of the person who claims it and takes the steps prescribed to gain it. And, generally, it is true that, even when property is dedicated or appropriated to public use for gain by persons or private corporations, the title and ownership is private and the only interest of the public is that of beneficiaries of the use or trust. The property does not become impressed with a public use or trust until after the owner has first acquired it and then dedicated it to the use. The acts of acquisition and of dedication respectively, are distinct from each other. Technically the latter must follow the former and cannot precede or accompany it. An "appropriation of water" under the code is therefore not, *ipso facto,* a dedication or appropriation to public use. The additional act of dedication is as necessary to the creation of a public use in a water-right so acquired as it would be if the right was acquired by conveyance or in any other manner, or as in the case of any other property dedicated to public use. It follows that if the water appropriated from the Colorado River by the California Development Company is now devoted or dedicated to public use so as to be available to the use of the plaintiffs, it is because of some acts or declarations of that company other than those by which it acquired the right to divert the water from the river.

Definitions of the term "public use" are usually found in decisions involving the right of eminent domain or in those relating to public charities. A bequest to establish a home for the orphans of deceased Odd Fellows is not made to a public use. In deciding this point the court says: "It is an essential feature of the latter (a public trust) that the beneficiaries are uncertain; a class of persons described in some general language, often fluctuating, changing in their individual members, and partaking of a *quasi* public character. . . . The smallest street is public, for all have an equal right to travel on it; but a way used by thousands, which may be shut against a stranger, is private." (*Troutman Co.* v. *De Boissiere,* 66 Kan. 1, [71 Pac. 286]; *Pennoyer* v. *Wadhams,* 20 Or. 274, [11 L. R. A. 210, 25 Pac. 720]; *Burd Orphan Asylum* v. *School Dis.,* 90 Pa. St. 29.) "The gen-

eral public must have a definite and fixed use of the property to be condemned; a use independent of the will of the private person or private corporation in whom the title to the property, when condemned, will be vested, a public use, which cannot be defeated by such private owner.'' (*Fallsburg P. Co.* v. *Alexander,* 101 Va. 98, [99 Am. St. Rep. 855, 61 L. R. A. 129, 43 S. E. 194].) This case holds that water to be acquired by a company for transmission and distribution to any place ''for its own use or for the use of other individuals or corporations,'' would not be devoted to public use, because the company retained power to choose who should have it. (See, also, *Tyler* v. *Beacher,* 44 Vt. 648, [8 Am. Rep. 398]; *In re Barre,* 62 Vt. 32, [9 L. R. A. 195, 20 Atl. 109]; *Ryerson* v. *Brown,* 35 Mich. 333, [24 Am. Rep. 564].) The term ''public use'' ''implies 'the use of many' or 'by the public,' but it may be limited to the inhabitants of a small or restricted locality, but the use must be in common and not for a particular individual.'' (*Pocantico* v. *Bird,* 130 N. Y. 249, [29 N. E. 246].) Water carried in a ditch to be let out for hire to all who apply for it, is devoted to public use. (*Paxton* v. *Farmers' Co.,* 45 Neb. 894, [50 Am. St. Rep. 585, 29 L. R. A. 853, 64 N. W. 343].) Market stalls which the owner lets out to such persons and upon such terms as he chooses are not in public use. The test is ''whether the public have the legal right to the use, which cannot be gainsaid, or denied, or withdrawn, at the pleasure of the owner.'' (*Farmers' Market Co.* v. *Railroad Co.,* 142 Pa. St. 580, [21 Atl. 902, 989].) ''The essential feature of a public use is that it is not confined to privileged individuals, but is open to the indefinite public. It is this indefiniteness or unrestricted quality that gives it its public character. The smallest street in the smallest village is a public highway of the commonwealth, and none the less so because the vast majority of the citizens will never derive any benefit from its use. It is enough that they may do so if they choose.'' (*White* v. *Smith,* 189 Pa. St. 228, [43 L. R. A. 498, 42 Atl. 125]; *Donohugh's Appeal,* 86 Pa. St. 306. See, also, *Phillips* v. *Watson,* 63 Iowa, 33, [18 N. W. 659]; *Bennett's Appeal,* 65 Pa. St. 250; *Dalles* v. *Urquhart,* 16 Or. 67, [19 Pac. 78].)

In the case of the use of water in villages, towns, and cities, the right to the use usually extends to every inhabitant

within the range of the distributing system or who can get
access thereto. In the case of water for irrigation, the class is
necessarily more select, and does not include the general pub-
lic within the area served. But this is so because it is not
every inhabitant that can make that use of the water. Only
those occupying land can do so. And for this reason it is
held that while there may be a public use for the benefit of
landowners, the use of water for irrigation is not public unless
the water is available, as of right, upon equal terms, to all
landowners of the class and within the area to be benefited
who can get water from the ditches to their lands. If the
dispenser of water has the right to say who shall have it, and
upon what terms, selling to one and refusing to sell to an-
other at will, it is not devoted to public use.

In *Fallbrook Irr. Dist.* v. *Bradley*, 164 U. S. 161, [41 L. Ed.
369, 17 Sup. Ct. Rep. 56], the United States supreme court
was considering the question whether or not the water be-
longing to an irrigation district organized under the Cali-
fornia statute of 1887, and acquired for and applied to its
authorized uses and purposes, was water dedicated to a pub-
lic use. The circuit court had decided that it was not for
public use and that the district works were not public im-
provements, because the water was held for the exclusive use
of the landowners of the district and not for the general
public within its limits. Upon this question the supreme
court on appeal said: ''The fact that the use of the water
is limited to the landowner is not therefore a fatal objection
to this legislation. It is not essential that the entire commu-
nity, or even any considerable portion thereof, should directly
enjoy or participate in an improvement in order to consti-
tute a public use. All landowners in the district have the
right to a proportionate share of the water, and no one land-
owner is favored above his fellows in his right to the use of
the water. It is not necessary, in order that the use should
be public, that *every resident* in the district should have the
right to the use of the water. The water is not used for gen-
eral, domestic, or for drinking purposes, and it is plain from
the scheme of the act that the water is intended for the use
of those who expect to use it on their lands. . . . We think
it clearly appears that all who by reason of their ownership
of or connection with any portion of the lands would have

occasion to use the water would in truth have the opportunity to use it upon the same terms as all others similarly situated. In this way the use, so far as this point is concerned, *is public because all persons have the right to use the water under the same circumstances.* This is sufficient." (The italics are ours.)

The decisions in this state are to the same effect. The first and leading case on the general subject is *Gilmer* v. *Lime Point,* 18 Cal. 229, where it was held that a fort for protection against foreign invasion was a public use for which the state might authorize the condemnation of land. The court said (p. 252): "This public use need not be a use general or common to all the people of the state alike. It may be a use in which a small portion of the public will be directly benefited, as a street in a town, a bridge or a railroad, necessarily local in its benefits and advantages, but it must be of such a character as that the general public may, if they choose, avail themselves of it." In *Miners' Ditch Co.* v. *Zellerbach,* 37 Cal. 543, 590, [99 Am. Dec. 300], the plaintiff corporation was organized to take water from the Yuba River and use the same for mining and mechanical purposes and to sell it to others for mining purposes. It does not appear that it was offered generally to the public. The court said that the corporation was under no obligation to the public to continue the business, and that it "was created for the immediate benefit of its stockholders, with no direct specific public purpose in view, as in the case of a railroad or turnpike or canal company. The only interest the public has in the continuance of the business is the remote, general interest, which it has in the proper development of the resources of the country"; in effect, that its property was not devoted to public use. In *Price* v. *Riverside,* 56 Cal. 432, it is said that every corporation formed under the act of 1862, [Stats. 1862, p. 540], "has impressed upon it a public trust—the duty of furnishing water, if water it has, to all those who come within the class or community for whose alleged benefit it has been created." In *McCrary* v. *Beaudry,* 67 Cal. 120, [7 Pac. 264], it was decided that water conducted through pipes laid in the streets by permission of the city of Los Angeles, and supplied by the owner to residences along those streets at fixed rates, was devoted to a public use, and that residents

along such streets who had received the water were entitled
to have the service continued on paying the rates. In *Merrill* v. *South Side I. Co.,* 112 Cal. 426, [44 Pac. 720], the
defendant company was engaged in selling, distributing, and
delivering water for irrigation upon the lands along the line
of its pipe. Plaintiff's land was along said pipe-line and
defendant had sold plaintiff water to irrigate the same, but
refused to continue to do so and extended its pipes to new
lands to which it delivered the water previously supplied to
plaintiffs. It was held that this was a public use for the
lands along the pipe-line and that *mandamus* would lie to
compel a continuance of the supply to the plaintiff. In *Hildredth* v. *Montecito C. W. Co.,* 139 Cal. 29, [72 Pac. 395], it
was held that if the owners of several distinct water-rights
in a stream should form a corporation and give to it the duty
of diverting and distributing the water to the respective persons entitled, such water was not thereby devoted to a public
use. The court said that: "The right of an individual to a
public use of water is in the nature of a public right possessed by reason of his *status* as a person of the class for
whose benefit the water was appropriated or dedicated. All
who enter the class may demand the use of the water, regardless of whether they have previously enjoyed it or not." In
*McFadden* v. *Los Angeles,* 74 Cal. 571, [16 Pac. 397], a corporation had acquired water to be used on the land of its
stockholders only, and at rates fixed by the corporation. It
was not appropriated or offered for sale to others, or to the
public generally, but the stockholders were very numerous
and the corporation supplied water for some twelve thousand
acres of land. It was declared not to be a public use, the
court saying: "We know of no reason why individuals cannot associate themselves together, take on a corporate form,
and acquire water to be used on their own lands," and that
in such a case the supervisors had no power, under the act
of 1885 (Stats. 1885, p. 95), to fix rates as for a public use,
or at all. The proposition that such a use of the water is
not a public use was again affirmed in *McDermont* v. *Anaheim U. W. Co.,* 124 Cal. 114, [56 Pac. 779], and in *Barton*
v. *Riverside W. Co.,* 155 Cal. 518, [23 L. R. A., (N. S.), 331,
101 Pac. 790]. In *Leavitt* v. *Lassen I. Co.,* 157 Cal. 83, [29
L. R. A. (N. S.) 213, 106 Pac. 404], the water had been ap-

propriated for sale, rental, and distribution, the system had been in operation several years and it was conceded to be a public use.   It was held that the purveyor of the public use cannot make binding contracts to deliver to a landowner under the system more than his proportionate share of the water, or give him a preferential right over others, nor make any unfair discrimination between the beneficiaries of the use.

Under the doctrines thus established, it is evident that the California Development Company has not dedicated to public use the water which it diverts from the Colorado River and that it has not offered it for sale, rental, or distribution in such a manner as to constitute a public use thereof.   In its notice of appropriation it declared that it claimed the water for *itself and others*.   It did not claim it for use by the public, nor designate the "others" to whom it was to be furnished.   The notice stated that the water was claimed for the purpose of developing power and for the irrigation of lands in the "New River Country" situated in what was then San Diego County, but it did not say that it was to be used upon all said lands, nor generally upon the lands in said country. Upon each of these essential elements of a public use the most that can be said is that the notice is silent.   There never was any declaration by that company that the water was to be devoted to public use or that it was to be offered generally for sale in California, or to all landowners in the New River Country, or in any district or part thereof, or even to all landowners along the lines of its ditches or the ditches of its auxiliary companies.   No such offer or declaration has ever been made, nor has it ever been the custom or practice of the company, or of its auxiliary companies, to sell water in that way. The method adopted by it for the disposition of the water, and its conduct in distributing the same, have been wholly inconsistent with the idea that the water was held out for general sale or distribution, and it has been consistent only with the theory that the intention was to retain control of the water to the extent, at least, of choosing for itself the persons and corporations to whom it should be sold or delivered, and the terms and conditions on which such sales or deliveries should be made.   It has, in fact, retained such control and it has not disposed of the water otherwise than according to this plan.   For this purpose it laid out seven separate dis-

tricts in the New River Country, with distinct boundaries. In each of these it organized a private water corporation. The purpose of each corporation, as expressed in its articles, was to procure water for the irrigation of such lands situated within the exterior limits of the district as should belong to its stockholders, and to no other persons. Each share of the stock was to be located upon certain designated lands, one share being allotted to each acre, and the water was to be apportioned ratably among the stockholders according to the number of shares owned. The stock was not free, but was to be sold at a fixed price. To these corporations, and to no other persons, the Development Company sold the water it diverted, receiving therefor certain shares of stock of said corporations with the right to sell the same and have them located on lands in the district by the purchasers, and with an agreement by each auxiliary company to pay thereafter an annual charge of fifty cents per acre foot for the water delivered to it. There were other restrictions which it is not necessary to mention. The Development Company sold the stock of these auxiliary companies to the landowners within the respective districts and the same has been located by the respective companies upon particular tracts of land therein. No water has ever been sold or distributed or offered for sale or distribution, in any other way, or to any other persons, except small quantities furnished by special agreement to a power company and to the city of Imperial. No right in any other person to demand or receive water upon any terms or at all has ever been recognized, allowed, or conceded either by the Development Company or any of the auxiliary companies. It appears, therefore, that the Development Company has always, either directly or through the auxiliary companies, selected the persons to whom it would sell and distribute the water and fixed its own prices. A use thus restricted, limited, and controlled by the owner, is in no proper sense, according to the foregoing authorities, a public use.

We have hitherto considered the case upon the theory that all the other corporations mentioned, including the Mexican Company, are but subsidiary to and agents of the California Development Company for the carrying out of its plan for the distribution of its water. The effect is the same, however, if those companies should become, or be considered,

independent companies, that is merely purchasers of the Development Company's water. It is true that since their organization the districts, by reason of the sales of their corporation stock to the landowners, have become independent, so far as management is concerned, of the Development Company, although still bound by the contracts made between them. But if they are viewed as independent companies, the fact remains that the Development Company has not sold, or proposed to sell, or disposed of its water at all, except to those companies and to them only upon the terms and restrictions fixed by the respective contracts, and that those companies have not applied the water to public use, but have held the same exclusively for their respective shareholders upon terms fixed by the by-laws of the company. It appears that the Mexican Company is selling a part of the water to consumers in Mexico along its line. This does not change the result. It does not appear that this water is sold or offered to the public generally, or to all landowners along the line. Even if it were so, the fact that this company is carrying on a public use in Mexico would not affect the character of the service of the other companies doing business in California. It is very clear from all the proceedings taken, that the Development Company, not only did not intend to engage in a public service, but that it was well advised concerning such service and carefully devised its plan and drew its contracts to avoid being placed in that position. The company has placed itself clearly within the principles stated in *McFadden* v. *Los Angeles,* 74 Cal. 571, [16 Pac. 397]; *McDermont* v. *Anaheim Co.,* 124 Cal. 114, [56 Pac. 779], and *Barton* v. *Riverside,* 155 Cal. 518, [23 L. R. A. (N. S.) 331, 101 Pac. 790], under which the use which it makes of the water is not a public use.

The plaintiff claims, however, that notwithstanding these decisions and the well established meaning of the phrase "public use" as shown by the other decisions cited, the meaning of the phrase is defined in section 1 of article XIV of the constitution in terms which necessarily creates a public use whenever any water is sold or distributed, regardless of the number of persons to whom it is delivered, the manner or character of the disposition made of it, or of the transfer of the right thereto. The part of the section defining the

phrase is as follows: "The use of all water now appropriated, or that may hereafter be appropriated for sale, rental or distribution, is hereby declared to be a public use, and subject to the regulation and control of the state, in the manner to be prescribed by law." The remainder of the section provides for the fixing of rates for the use of water in municipalities. Section 2 declares that the right to collect rates for water supplied to a county, city and county or town, or the inhabitants thereof, is a franchise to be exercised only under and as prescribed by law.

In *Merrill* v. *Southside I. Co.*, 112 Cal. 426, [44 Pac. 720], it was held that the word "appropriation," in section 1 aforesaid, does not refer to the act by which the water is acquired, as the taking from the stream, for example, but to the act or acts by which it is designated, set apart, and devoted to the purposes of sale, rental, or distribution. According to the theory of the plaintiff in this case, whenever the owner of a water supply determines to and does sell it for a price agreed on between himself and the purchasers, it immediately becomes subject to public use, and any other person to whom it can be conveniently distributed in the same manner would have the right to a proportionate share of the water on the same terms as the purchasers, and, if the supply is limited, the first purchasers must divide with all others who may come in and claim a share. Under that theory, where a person having a surplus of water parts with a portion of it by sales to others he thereby appropriates such portion to purposes of sale and dedicates it to public use. This application of the section would destroy private rights in water and convert every sale thereof into a dedication to public use. We do not believe that the constitution was intended to have such effect, or that it should be so construed. Article XIV taken as a whole shows plainly that it was intended to regulate the use of water appropriated and dedicated generally for sale and distribution among an indefinite number of users. It could not have been intended to declare that a single sale of a part of his water by one having more than he needs would convert the use into a public use in which others could share. If a single sale could not do this, other sales of like character would not accomplish it. The

section must be understood to apply to cases where one has appropriated water generally, for sale, rental, or distribution, and not to cases where sales are made to particular persons at a fixed price by ordinary contracts of purchase and sale. To compel such a subdivision and distribution of water supplies as this construction would entail would destroy the value of all water-rights. In this state the water supply is so small that large areas must go without irrigation entirely. Such water as there is must be applied, as far as it will go, in quantities sufficient to make the lands profitably productive. The principal benefit of irrigation comes from its use in growing vineyards and orchards. These require a large expenditure and a permanent water supply to make them profitable. If those engaging in such enterprises know that they must be ready always to divide their water supply with those in the vicinity who may subsequently choose to engage therein, such enterprises would be discouraged, the development, growth, and progress of the state would be much retarded and its productive capacity greatly decreased.

This provision of the constitution has been in force thirty-three years. It has never been understood that it had the effect here contended for. There have been many instances in which the owners of large tracts of land have acquired water, conducted the same to the land, and sold and conveyed the land in small tracts to actual settlers with a proportionate share of the water appurtenant to the land, coupled with an agreement to continue the water supply at a fixed annual rate. Such a disposition is essentially a matter of private contract and it shows no intent to create a public use. It has also been a frequent practice to effect the same general purpose by forming a corporation to hold the water supply and to issue stock at a fixed price entitling the holder to a share of the water at a fixed annual rate, thus making the stockholders themselves the indirect owners of the water. Many decisions of this court in various ways concern corporations of this character. Among them are the following: *Richey* v. *East R. W. Co.,* 141 Cal. 221, [74 Pac. 754]; *Estate of Thomas,* 147 Cal. 236, [81 Pac. 539]; *Southside I. Co.* v. *Burson,* 147 Cal. 406, [81 Pac. 1107]; *Mabb* v. *Stewart,* 133 Cal. 556, [65 Pac. 1085]; s. c. 147 Cal. 417, [81

Pac. 1073] ; *Curtin* v. *Arroyo etc. Co.,* 147 Cal. 338, [81 Pac. 982] ; *Arroyo etc. Co.* v. *Bequette,* 149 Cal. 546, [87 Pac. 10] ; *Fuller* v. *Azusa I. Co.,* 138 Cal. 204, [71 Pac. 98] ; *Spurgeon* v. *Santa Ana etc. Co.,* 120 Cal. 71, [39 L. R. A. 701, 52 Pac. 140] ; *Hewitt* v. *San Jacinto etc. Irr. Dist.,* 124 Cal. 186, [56 Pac. 893] ; *Goodell* v. *Verdugo etc. Co.,* 138 Cal. 310, [71 Pac. 354] ; *Barton* v. *Riverside W. Co.,* 155 Cal. 518, [23 L. R. A. (N. S.) 331, 101 Pac. 790] ; *Miller* v. *Imperial W. Co.,* 156 Cal. 27, [24 L. R. A. (N. S.) 372, 103 Pac. 227]. In none of them is there any suggestion that such disposition or distribution constitutes a public use. This method became so prevalent and so satisfactory, that in 1895 section 324 of the Civil Code was amended so as to provide that, in such cases, the by-laws might require the stock certificates to describe the land to which the stockholders' share of water was to be applied and that such stock should thereupon become appurtenant to such land.

This long continued understanding and application of this section of the constitution must be deemed to be a practical construction of it contrary to the theory of plaintiff. It was not intended to declare that specific sales of water, or transfers thereof to a particular person or persons chosen at the will of the holder of the supply, or the distribution thereof by private corporations among their stockholders for an agreed price and at annual rates fixed by the corporation itself, should be considered a dedication thereof to public use.

It would follow as a matter of course that neither the Development Company, nor either of the water companies organized by it, possesses the power of eminent domain. It is not asserted that either of them has ever claimed or attempted to exercise that power. The Mexican company has received from the Mexican government a grant of that power. But the fact that that company is carrying on a public service in Mexico and has devoted some water to public use there does not affect the water carried into the United States nor the character of the use thereof in California. Nor is the fact that it is all derived from the same source of any importance. A part of a stream, or a part of a single appropriation therefrom, may be devoted to public use and another part entirely to private use. (*Leavitt* v. *Lassen I. Co.,* 157 Cal. 83, [29 L. R. A. (N. S.) 213, 106 Pac. 404].)

Something is said in the argument in regard to the fact that the Development Company brings more water into California through its canal than is used, and that there is always some waste water discharged from the distributing canals or somewhere along the route and that this is more than enough to supply the plaintiff.  There is generally some unavoidable waste in any large irrigating system.  Water must be turned into canals leading to lands where it is to be used. The users may not be ready to commence taking it.  As it cannot then be turned back and made to run up hill, it must be allowed to run down and go to waste, unless some independent user takes it below the waste gate.  So much of the water as may be unavoidably wasted is to be deemed a part of that which is appropriated to the beneficial use and which the company has the right to take.  It is necessary to the use and is in the same category as that lost in transmission by evaporation and unavoidable seepage.

So far as any other waste of the water is concerned, it is water to which the defendants have acquired no right.  Their right is measured by the quantity which is put to beneficial use, by which is meant the quantity necessary to be taken from the source to supply that use at the place of use.  The taking of more would be a taking without right.  But the excess, if any, has not been applied by any of the defendants to any public use in California.  The plaintiff, or any person, could appropriate such excess by an independent diversion from the Colorado River, and thereby prevent defendants from taking it.  Until she does so she has no more right to it than the defendants have.  Doubtless she is not in a position to do this, but the defendant is not a common carrier of water and it cannot be compelled to take it from the river for the benefit of plaintiff, carry it through Mexico for her and deliver it to her in California.  The case, in this aspect, is one of apparent hardship, but the courts cannot compel such service. As a matter of general policy we doubt if it is important, for it is not likely that the waste will be allowed to continue, since the defendants could readily make a profitable use of it by increasing their capital stock and applying it to the additional lands to which it could thus be made available, without any change in their method of distribution.  In any event,

the plaintiff has no rights to it which can be enforced by *mandamus*.

The judgment is reversed.

Beatty, C. J., does not participate in the foregoing decision.

Rehearing denied.